**ZENITH ELECTRONICS CORPORATION, Plaintiff–Appellant,**

v.

**PANALPINA, INC., Defendant–Appellee.**

**No. 95–1912.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 7, 1995.

Decided Oct. 16, 1995.

**198**

Thomas F. Bush, Jr. (argued), Thomas A. Doyle, Saunders & Monroe, Chicago, IL, for Plaintiff–Appellant.

Thomas F. McFarland, Jr., Stephen C. Herman, Belnap, Spencer, McFarland & Herman, Chicago, IL, Andrew B. Sacks (argued), Cynthia C. Crawford, Galland, Kharasch, Morse & Garfinkle, Washington, DC, for Defendant–Appellee.

Before RIPPLE, MANION and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Zenith Electronics Corporation ("Zenith") filed suit against Panalpina, Inc. ("Panalpina") claiming breach of fiduciary duty, breach of contract, and breach of duties imposed by the 1984 Shipping Act, 46 U.S.C.App. § 1701 et seq.[1] Zenith alleged that Panalpina's failure to deliver bills of lading to a guarantor bank in a timely fashion resulted in Zenith's failure to collect the purchase price of goods it shipped to a customer in Peru. The district court granted summary judgment for Panalpina, finding Zenith's suit barred by a one-year limitation clause incorporated in the bills of lading. For the reasons that follow, we reverse and remand for further proceedings.

## I

## BACKGROUND

### A. *Facts*

In the summer of 1991, Zenith contracted to sell 2,100 television kits to Electronica Bellavista, one of its customers in Peru. To secure payment by the foreign customer, Zenith and Electronica Bellavista set up a commonly used letter of credit arrangement, under which Zenith would be paid by a U.S. bank, the Hamilton Bank of Miami, upon presentation to the bank of a clean bill of lading. After a series of extensions, the letter of credit was set to expire on September 30, 1991.

According to its complaint, Zenith retained Panalpina to serve as the freight forwarder, or forwarding agent, for the shipment to Peru. Freight forwarders essentially "act as export departments for their shipper clients," *New York Foreign Freight Forwarders & Brokers Assn. v. Federal Maritime Comm.*, 337 F.2d 289, 292 (2d Cir.1964), *cert. denied*, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965), making all necessary arrangements to dispatch merchandise to a foreign port.[2] Zenith, through its export manager Donna Wojcik, was informed that Panalpina would be issuing its own bills of lading for the shipment. Zenith then prepared the television kits and other documents for shipment by Panalpina.

---

1. Jurisdiction in the district court was based upon diversity of citizenship. 28 U.S.C. § 1332. The complete diversity requirement and the amount in controversy are both satisfied. The jurisdiction of this court is based upon 28 U.S.C. § 1291. Although Panalpina still has a counterclaim pending in the district court, Zenith sought and received the appropriate Rule 54(b) certification.

2. For a thorough description of the role of freight forwarders in international shipping, see *United States v. American Union Transport, Inc.*, 327 U.S. 437, 442–43, 66 S.Ct. 644, 647–48, 90 L.Ed. 772 (1946).

Because Panalpina is not itself a carrier, one of its obligations as freight forwarder was to arrange for transportation services with an oceangoing carrier. Panalpina used Pantainer, Inc. ("Pantainer"), its wholly-owned subsidiary and in-house NVOCC,[3] to effect the Zenith shipment. Zenith's television kits left U.S. port on September 18, 1991 and arrived in South America on October 11, 1991.

After the departure of the shipment, Zenith received copies of two bills of lading from Panalpina, each bearing the name "Pantainer" at the top, to cover the ocean carriage to Peru. On the back of each bill of lading are several printed "Terms and Conditions." Paragraph 8 of these terms, entitled "Time Bar," provides:

> Carrier shall be discharged from all liability unless suit is brought within twelve months after the date of delivery of the goods, or after the date when the goods should have been delivered. Suit shall not be deemed brought against Carrier until jurisdiction shall have been obtained by service of process on Carrier.

Panalpina's obligations as freight forwarder required it to prepare the necessary shipping documents and present them to the Hamilton Bank of Miami for payment under the letter of credit. The bills of lading, however, were not presented to the bank until October 3, 1991, three days after the letter of credit expired. As a result of the untimely presentment, Hamilton Bank refused to release the funds.

In November of 1991, Panalpina informed Zenith that it had failed to properly present the bills of lading to Hamilton. Zenith filed suit against Panalpina in March of 1994; its complaint alleged that Panalpina, through its mishandling of the shipping documents, had breached its contract with Zenith, breached the fiduciary duty it owed to Zenith, and breached the duties imposed on freight forwarders by the 1984 Shipping Act. *See* 46 U.S.C.App. § 1709(d)(1).

Panalpina moved for summary judgment, arguing that Zenith's claim was barred by the one-year limitation period found in the bills of lading. Neither party disputed that Zenith's claim was brought after the limitation period had run. The motion for summary judgment turned, therefore, on whether Panalpina could avail itself of the time-bar defense.

### B. *Proceedings in the District Court*

The district court concluded that Panalpina could avail itself of the time-bar defense and, accordingly, granted summary judgment on that basis to Panalpina. Noting that Panalpina, as parent corporation of Pantainer, had conceded its vicarious liability for any wrong committed by Pantainer, the district court concluded that the only issue to be decided was whether Zenith is barred by the limitation period.

With the issue framed in this manner, the threshold inquiry for the district court was whether a contract existed between Pantainer and Zenith. The district court answered this question in the affirmative, since 1) Panalpina, through Pantainer, provided shipping services at the request of Zenith; 2) Zenith knew that Panalpina would issue its own bill of lading; and 3) Ms. Wojcik, in her deposition testimony, stated that she understood that the bills of lading would govern the agreement between Panalpina and Zenith. Under the law of agency, the district court found, Zenith was bound by the bills of lading it executed with Pantainer, an agent acting on behalf of its principal, Panalpina. The district court further concluded that Panalpina, as Pantainer's principal, could avail itself of the same defenses that Pantainer would be entitled to, including the time-bar provision found in the bills of lading. Finding the time-bar provision unambiguous, the district court concluded that no genuine issue of material fact existed for trial and entered summary judgment in favor of Panalpina.

---

**3.** An NVOCC (Non Vessel–Operating Common Carrier) is a common carrier which does not transport goods on its own ships. Rather, it performs services for the shipper such as consoli-

dating small cargoes in large containers in order to obtain better rates from the VOCC and supplying trucks and heavy lifting equipment.

## C. *Contentions of the Parties*

Before this court, Zenith contends that the district court erred in allowing Panalpina to avail itself of a contractual time limitation. In its view, the plain terms of the bill of lading do not apply, at least with respect to the limitations period, to claims against Panalpina. The terms of the time-bar provision discharge the "Carrier" from liability after one year; "Carrier" is defined by the bill of lading as "Pantainer, Inc., d/b/a Pantainer Express Line." By contrast, the document elsewhere identifies Panalpina as the "Forwarding Agent." The district court, Zenith argues, disregarded the plain language of the contract when it applied the time-bar to claims against Panalpina.

Zenith also submits that the district court's heavy reliance on Ms. Wojcik's deposition testimony acknowledging her understanding that the bills of lading would govern the entirety of Zenith's relationship with Panalpina was unwarranted. Zenith contends that, in the context of the broad questions put to her by counsel for Panalpina, a jury reasonably could find that her responses did not necessarily apply to the time-bar provision, but meant instead that the bill of lading would cover shipment terms and other general provisions. Zenith argues that this uncertainty, when coupled with the plain language of the bill of lading, raised a genuine issue of fact sufficient to preclude summary judgment.

Moreover, Zenith contends, any agency relationship between Panalpina and Pantainer does not alter the plain language of the bill of lading. A principal (Panalpina), Zenith argues, is entitled to use the defenses available to its agent (Pantainer) only when the principal's liability is predicated on the agency relationship. Whether or not Pantainer was Panalpina's agent is immaterial in this case, because Zenith's claim arises from Panalpina's direct negligence in carrying out its duties as forwarding agent—not Panalpina's vicarious liability for acts committed by Pantainer. Zenith supports this contention by demonstrating, count by count, that its complaint is based on Panalpina's direct liability for mishandling the bills of lading.

Zenith admits there is a contract between itself and Pantainer and that this contract is embodied in the bills of lading. It further contends, however, that a separate relationship and contract exists between Zenith (as shipper) and Panalpina (as freight forwarder). In support of this allegation, Zenith directs us to the bills of lading identifying Panalpina as "Forwarding Agent" and Zenith's letter of instruction to Panalpina outlining the nature of Panalpina's duties.

Finally, Zenith argues, the district court erred in allowing the parent-subsidiary relationship between Panalpina and Pantainer to limit Panalpina's liability. Zenith contends that the two cases relied upon by the district court, *Pasco International (London) Ltd. v. Stenograph, Corp.*, 637 F.2d 496 (7th Cir. 1980), and *Allegheny Airlines v. United States*, 504 F.2d 104 (7th Cir.1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975), scrutinized certain parent-subsidiary relationships in order to expand the liability of the parent corporation. These cases, it argues, do not permit a parent corporation such as Panalpina to manipulate the parent-subsidiary relationship and insulate itself from its own liability.

Panalpina characterizes the relationship between Zenith, Panalpina, and Pantainer much differently. According to Panalpina, the only operative contractual relationship is between Zenith and Panalpina and embodied in the bills of lading. Because Zenith could only assert a direct liability claim against Pantainer, the argument continues, Zenith has sued the wrong defendant.

Several arguments flow from Panalpina's characterization. At the outset, Zenith's "plain language" argument is misplaced. Panalpina is entitled to the time-bar defense, it contends, not because Panalpina is the "Carrier" described in the bill of lading, but rather because Panalpina is, under the circumstances, entitled to use Pantainer's defenses. Although Zenith sued the wrong defendant, Panalpina claims that, because it has voluntarily claimed responsibility for Pantainer's acts and omissions, it is entitled to use any and all defenses Pantainer would have available, including the contractual time-bar provision.

Moreover, Panalpina argues, Zenith was aware that the time-bar provision would govern the transaction. For this proposition, Panalpina places heavy reliance on Ms. Wojcik's deposition testimony.[4] Panalpina argues that the deposition testimony establishes Zenith's awareness of two key facts: (1) that Panalpina would be issuing its own bill of lading, and (2) that an industry-standard time-bar provision would be included in the document and govern the transaction. For additional support, Panalpina points to the fact that Pantainer had a sample bill of lading, containing the time-bar provision, on file with the Federal Maritime Commission as part of its mandatory tariff filing.

Panalpina offers an alternative ground for summary judgment. Panalpina maintains that, even if there is a contract between Zenith and Panalpina for freight forwarding, trade usage for freight forwarders in the ocean shipping industry would provide a nine-month time-bar term to bar Zenith's claim. An experienced shipper such as Zenith, it contends, must be held to know of the existence of such a term.

## II

## DISCUSSION

■ At the outset, we think it important to note the procedural posture in which this case comes to us. This case is here following entry of summary judgment in favor of the defendant, Panalpina. We review the district court's grant of summary judgment de novo. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995). All facts and reasonable inferences to be drawn therefrom are viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

Summary judgment is only appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In presenting its motion for summary judgment to the district court, Panalpina took the posi-

tion that Zenith's suit was barred by a limitation provision in the bill of lading which Pantainer, its wholly owned subsidiary, employed in its capacity as carrier. Because Panalpina asserted this affirmative defense as the basis for its entitlement to summary judgment, the ultimate burden of establishing that the time-bar provision applies to Zenith's suit rested at all times squarely on Panalpina. *Cf. Havoco of America, Ltd. v. Freeman, Atkins, and Coleman, Ltd.*, 58 F.3d 303, 306 (7th Cir.1995) (on summary judgment motion, defendant has burden of establishing affirmative defense of collateral estoppel).

■ Our starting point is different from that of the district court. In our view, the most important issue for determination is whether an agreement exists between Zenith and Panalpina for freight forwarding services and, if so, the understanding of the parties with respect to that agreement. Specifically, we are confronted with the question of whether a contractual time-bar provision is part of that understanding. Neither party contests that such a limitation can govern the rights of the parties. Assuming the correctness of this concession, we are then left in essence with a question of contractual interpretation.

At the outset, we are not persuaded that the only contractual relationship was that which existed between Zenith and Pantainer. Two documents in the record memorialize an agreement between Zenith and Panalpina for the provision of freight forwarding services: 1) the shipper's letter of instruction, executed by Zenith's export manager and addressed to Panalpina; and 2) the bills of lading executed by Pantainer as carrier. The first document, a standard form under the logo and letterhead of Zenith, sets forth the basic duties that Panalpina, as freight forwarder, was obliged to undertake. Those duties included not only the obligation to secure transportation for the goods, but also the obligation to send the original bills of lading to the Hamilton Bank in Miami, Florida. The second set of documents, the bills of lading, clearly iden-

---

4. Panalpina defends the district court's examination of the deposition testimony, claiming that its purpose is not to vary the terms of the written contract, but to show the existence of a contract containing the time-bar provision and to show Zenith's knowledge of it.

tify Pantainer as the "Carrier" and Panalpina as the "Forwarding Agent" for the shipment. Based on the record before us, then, we cannot say as a matter of law that no contractual relationship existed between Zenith and Panalpina.

To understand the terms of this agreement between Zenith, as shipper, and Panalpina as freight forwarder, we examine these same two documents. In the "Terms and Conditions" section of the bill of lading, paragraph 8 explicitly provides:

> 8. Time Bar
>
> Carrier shall be discharged from all liability unless suit is brought within twelve months after the date of delivery of the goods, or after the date when the goods should have been delivered. Suit shall not be deemed brought against Carrier until jurisdiction shall have been obtained by service of process on Carrier.

Confronted with the express language of this provision, we are faced with the stark reality that the operative paragraph explicitly refers to the carrier, not the freight forwarder.

Examining the letter of instruction, it is clear that Panalpina's undertaking is a great deal broader than the carriage of goods and specifically included the obligation to present the bills of lading to the Hamilton Bank. The letter of instruction does not contain a time-bar provision with respect to this obligation nor does it reference paragraph 8 of the bill of lading.

When read together, these documents hardly establish that Panalpina, as freight forwarder, enjoys the protection of paragraph 8 of the bill of lading with respect to the performance of its duties as freight forwarder. Indeed, these documents are, on their face, at least as supportive of the inference that the time-bar provision is limited to the obligations of the carrier as they are supportive of the inference that the freight forwarder is bound by its terms.

Panalpina contends, nevertheless, that the extrinsic evidence makes it clear that Zenith agreed that the entirety of its relationship with Panalpina would be governed by paragraph 8. In this regard, it relies heavily on the deposition testimony of Zenith's Export Manager, Donna Wojcik. At her deposition, the following exchange took place:

Q. Panalpina explained to you that they would be issuing their own bill of lading?

A. Correct.

Q. But that bill of lading had the name Pantainer on top of it?

A. Yes.

Q. You understood that the bill of lading would govern the relationship between you and Panalpina?

Mr. Doyle: Objection to the form.

A. Yes.

Q. The one with the Pantainer name on it, correct?

A. Correct.

    *   *   *   *   *   *

Q. Now, I call your attention to the limitation of liability provision, paragraph 4, and it says, Liability for loss of damage to the goods shall not exceed $500 per package.

You see that?

A. Yes.

Q. Have you seen similar provisions in other contracts with NVOCCs?

Mr. Doyle: Object to the form.

By Mr. Sacks:

Q. As a matter of fact, you understand that these are standard terms and conditions that are used throughout the industry?

Mr. Doyle: Object to the form.

By Mr. Sacks:

Q. Paragraph 8 says, Time Bar, Carrier shall be discharged from all liability unless suit is brought within 12 months after the date of delivery of the goods or after the date when the goods should have been delivered.

Do you see that provision?

A. Yes.

Q. Have you seen similar provisions or identical provision in other terms and conditions on the back of NVOCC bills of lading?

Mr. Doyle: Object to the form.

The Witness: Yes.

By Mr. Sacks:

Q. And you understand that to be a standard term and condition for NVOCC bills of lading?

A. Yes.

Q. And you had—the understandings that you have just described, you had those in 1991 at the time you contacted Panalpina about the shipment?

Mr. Doyle: Object to the form.

The Witness: Prior to the shipment?

By Mr. Sacks:

Q. At the time you contacted Panalpina about the shipment, the understandings that we have just discussed that there are standard terms and conditions on the back of NVOCC bills of lading; and those standard terms and conditions include the limitation of liability section and the 12 month time bar section. Did you have the same understandings in 1991 that you have today?

A. Yes.

Q. Is that pretty much common knowledge in the shipping industry?

Mr. Doyle: Objection.

The Witness: Yes.

Even if we were to hold that counsel's broad questions and Ms. Wojcik's laconic responses raise an issue of fact as to the meaning of the documents to which we have just referred, we must also acknowledge that her testimony is susceptible of a reading compatible with the plain wording of the documents. In the context of the questions asked by counsel, it is entirely possible that Ms. Wojcik was merely acknowledging that the bills of lading set forth the terms of shipping that Panalpina had arranged for Zenith in Panalpina's capacity as "forwarding agent." Indeed, the plain wording and organization of the bill of lading would appear to support such a view.

Similarly, the affidavit of Panalpina's Treasurer, Walter Zurcher, stating that Panalpina told its customers that either Panalpina or Pantainer will provide transportation services and that both companies perform "the same kinds of services" raises, at most, an issue of fact as to whether Mr. Zurcher meant that the services were co-extensive.

Nor do we believe that the mere existence of a parent-subsidiary relationship between Pantainer and Panalpina establishes, in any conclusive way, the applicability of paragraph 8 to all of Panalpina's freight forwarding duties.

 Panalpina has also failed to establish that trade custom and usage entitles it to judgment as a matter of law. As the party seeking to rely upon trade usage, Panalpina has the burden to establish both the existence and applicability of the custom to the present transaction. *See Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1134–35 (7th Cir.1983). On the record before us, we cannot say that Panalpina has met this burden.

Because we do not believe that Panalpina has established the absence of a factual issue as to whether it may enjoy the protection of the limitations period in the bill of lading, we must reverse the grant of summary judgment in its favor.

REVERSED.