Michael GOLDSTEIN, Plaintiff–
Appellant,

v.

FIDELITY AND GUARANTY INSUR-
ANCE UNDERWRITERS, INC., a/k/a
United States Fidelity and Guaranty
Company, Defendant–Appellee.

No. 95–2922.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 16, 1996.

Decided June 21, 1996.

Robert P. Zapinski, David C. Bohan (argued), Michael G. Cartier, Jenner & Block, Chicago, IL, for Plaintiff-Appellant.

Gary P. Hollander, Roger A. Bixby (argued), David C. Lechner, Bixby, Lechner & Potratz, Chicago, IL, for Defendant-Appellee.

Before CUMMINGS, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Two fires—one in October of 1992 and the other in April of 1993—combined to destroy a complex of four interconnected buildings at 1775–1825 West Diversey Street in Chicago. The Diversey Street property was one of several commercial properties in Chicago owned by Michael Goldstein and his company, Gold Realty Group. This litigation concerns a claim by Goldstein against his insurance company, whose name we'll shorten by calling it Fidelity, growing out of the fire. Goldstein moved for summary judgment in the district court, but the tables were turned on him when the judge, *sua sponte*, granted summary judgment for Fidelity. Goldstein appeals.

Before addressing the district court's disposition of the substantive issues, we must determine whether it was cricket for the court to enter summary judgment on its own motion. As everyone knows, summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146 (7th Cir.1994). And a district court may enter summary judgment in favor of a party even if no motion for relief of that sort has been filed. *Hunger v. Leininger*, 15 F.3d 664 (7th Cir.1994). This course of action, however, raises concerns in addition to the usual ones present in a motion for summary judgment. The party against whom summary judgment is entered must have notice that the court is considering dropping the ax on him before it actually falls. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the entry of summary judgment is inappropriate when it takes a party by surprise. *Choudhry v. Jenkins*, 559 F.2d 1085, 1089 (7th Cir. 1977).

In our case, of course, Goldstein filed a motion for summary judgment. Both parties, Goldstein in particular, were on notice that summary judgment was being considered. In the motion for summary judgment he chose to present to the district court, Goldstein claimed that no genuine issues of

material fact existed in the case. As a general rule, however, a motion for summary judgment is not a waiver of the right to trial if the motion is denied. *Market Street Assocs. Ltd. Partnership v. Frey,* 941 F.2d 588, 590 (7th Cir.1991). This means that if the district court disagreed with Goldstein as to the existence of a genuine issue of material fact, Goldstein would not be precluded from arguing the facts at trial. It does not mean that if the district court agreed with his characterization of the facts, Goldstein can wiggle out of his concession and compel a reversal of a judgment against him based on questions of law. Here, Judge Kocoras in the district court thought Goldstein was right about the facts but wrong on his assertion that he was entitled to judgment as a matter of law. Goldstein now claims that the resolution of the legal issues against him was inappropriate because he was not allowed to contest the facts, and that he would have had "greater incentive" to seek out disputed facts had he known summary judgment was being considered in a mode other than in his favor. At oral argument, we asked Goldstein's counsel if this wasn't a bit of lawyerly gameplaying. He said it was not. We disagree.

■ We do not want to encourage district courts to consider summary judgment *sua sponte* because the procedure warrants "special caution," and it's often inappropriate. *See Sawyer v. United States,* 831 F.2d 755 (7th Cir.1987). It is also largely unnecessary, as a district court can always invite a nonmoving party to file a motion for summary judgment in its favor. But while we do not express resounding approval of *sua sponte* summary judgment, it is not always wrong for a district court to resolve certain cases in this fashion. It's just a bit risky. In this case, however, we conclude that Goldstein was afforded the necessary safeguards, and that the potential hazards of the procedure were avoided. No genuine issue of material fact existed, and disposition of the case hinged on the judge's interpretation of the insurance policy. We reject the claim that Judge Kocoras, in this case, was wrong to act *sua sponte.*

Having determined that the entry of summary judgment on the court's own motion was not erroneous in and of itself, we turn to the disposition of Goldstein's substantive claims. We review the district court's grant of summary judgment *de novo. Zenith Electronics Corp. v. Panalpina, Inc.,* 68 F.3d 197, 201 (7th Cir.1995). Here are the facts.

The Diversey Street buildings were one of ten Goldstein properties insured under a Fidelity policy covering a one-year period starting on September 1, 1992. Prior to September 1, 1992, Goldstein's ten properties were insured under two Fidelity policies through the Associated Agency. One policy covered nine locations; the other covered the buildings on Diversey Street. During the summer of 1992, Goldstein shifted his account from the Associated Agency to the Mesirow Agency, which handled the 1992 renewal of coverage. Mesirow submitted one renewal request to Fidelity, covering all ten Goldstein properties. During the renewal process, Mesirow asked Fidelity (on August 27, 1992) to charge a lower premium rather than a higher "non-sprinklered" rate for the Diversey property because the sprinkler system in the buildings was being restored. Fidelity agreed. The premium thus set, on all ten properties, was $55,497 for the one-year policy. Goldstein apparently paid this sum to Mesirow sometime before October 5, 1992, but it was not sent to Fidelity by Mesirow until November 10, 1992. And actually, when it was sent, $44,515.95 went to Fidelity; Mesirow retained $10,981.05 as a commission.

Although coverage kicked in on September 1, 1992, the policy itself was not actually issued to Goldstein until October 29, 1992. Between September 1 and October 29, Goldstein's properties were covered under the terms of a binder issued by Mesirow. Also between those dates, on October 5, a fire broke out at the West Diversey property, destroying two buildings and damaging one other.

The binder issued by Mesirow contained a waiver of Fidelity's standard policy provision regarding sprinklers called, in insurance lingo, a "protective safeguards endorsement." If not waived, the endorsement would have required Goldstein to maintain, as a condition of coverage, an automatic sprinkler system to protect the property against fires. (It seems

Mesirow may have put the endorsement waiver in the binder contrary to his authority as a Fidelity agent, but that is neither here nor there at this time). The actual policy, when issued at the end of October, did, contain the endorsement, which said, "As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule." The protective safeguard listed in the schedule was an automatic sprinkler system. The endorsement further provided that Fidelity

> will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you ... [k]new of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or ... [f]ailed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

After the October 5 fire, Goldstein and Fidelity started to circle each other as they began shadow-boxing over the claim. Fidelity suspected arson—at least at first. Also, Fidelity was unaware that the binder contained the protective safeguard endorsement waiver, for it wrote to Goldstein on October 23 that

> [o]ur investigation thus far, leads the Fidelity & Guaranty Insurance Underwriters Inc. to believe that the sprinkler system was not operable on the date of loss at the destroyed premises where the fire occurred. The policy contains a Protective Safeguard Endorsement and you should refer to that endorsement regarding the protective safeguard requirements.

Goldstein and Fidelity each turned to professionals-the public adjusting firm of Laske, Warner & Associates, Inc. doing battle for Goldstein and the firm of R.S. Rozak and Company entering the ring on behalf of Fidelity. The insurance investigation continued for several months and included hiring a fire cause and origin expert, hiring an electrical engineer, hiring a sprinkler engineer, locating witnesses, taking recorded statements, requesting and reviewing numerous documents, and taking statements under oath.

Goldstein received a copy of a December 16, 1992, letter from Rozak, representing Fidelity, to the All American Bank (Goldstein's mortgagee and an additional named insured under the policy) warning that a future fire might not be covered if the sprinklers were not working. The letter said:

> This letter is to advise you that the sprinkler fire protective system in the six story building is required to be operative and in service under the insurance policy....

> The intention of this letter is to advise you that should another loss occur IT may not be covered under the referred to policy of insurance.

Beginning in mid-November of 1992, Goldstein requested an advance from Fidelity on the claim. Fidelity advanced $20,000 on November 23, 1992, to Goldstein and other payees, including the All American Bank. The bank demanded that Goldstein apply the entire advance to reduce his delinquent mortgage account. Goldstein, however, was able to negotiate with the bank to use $4,535.54 of the advance to secure the property damaged by the fire. None of the money, or Goldstein's own funds for that matter, went into the sprinkler system.

Goldstein presented a proof of loss to Fidelity on December 18, 1992, for the October 5 fire which claimed: the replacement cost of the entire complex was $4,171,349; the replacement cost of the building damage was $1,955,645; the depreciation applicable to the damage was $713,776; and the actual cash value loss (before a $5,000 deductible) was $1,241,869. These figures are interesting because just before the fire Goldstein was negotiating to sell the entire Diversey Street property—he had a sales contract dated August 19, 1992, in hand, signed by the potential buyer, for $750,000. Goldstein acknowledged that the $750,000 price was an acceptable sales price. Anyway, the adjusters continued to meet and negotiate the loss.

The All American Bank, as was its right as an additional insured under the policy, submitted its own proof of loss to Fidelity on January 27, 1993. The bank asked to be paid on the understanding that Goldstein's claim for the fire of October 5, 1992, had been denied. The bank's proof of loss claimed $638,593.88. On February 10, 1993, Rozak

advised the bank that Goldstein's claim was still being investigated, that it was not denied, and that the bank's proof of loss was, for that reason, premature.

On March 12, 1993, Fidelity issued a second advance check, this one for $100,000 payable to the bank. The bank applied $35,798.40 of the advance to the mortgage and put the rest in a "reserve" on Goldstein's mortgage account. This payment was made just after Fidelity finally discovered that the Mesirow Agency had included the waiver of the protective safeguards endorsement in the binder. Fidelity, of course, then decided not to assert a protective safeguards defense to the October 5 fire. The arson defense was also scuttled (for lack of evidence), and the fire was then treated by Fidelity as a covered loss.

An amended proof of loss was submitted by Goldstein to Fidelity on May 25, 1993, reflecting an agreement reached between the rival professional adjusters. The agreed values for the October 5 fire were: replacement cost damage of $1,114,489; depreciation of $391,175; and an actual cash value loss of $723,314.

On June 11, 1993, Fidelity sent checks for $593,314 to Goldstein for the October 5 fire. The sum reflected the agreed actual cash value building loss of $723,314 less reductions for the advances ($20,000 and $100,000) and two $5,000 deductibles. Added together, a total of $713,314 was paid by Fidelity for the loss stemming from the October 5 fire. The depreciation "holdback" of $391,175 for the October 5 fire was not paid as it was subject to a provision of the policy which required that the property actually be repaired or replaced as a precondition to payment.

On April 25, 1993, the second fire ignited, destroying the remaining structures on the Diversey Street property. It is undisputed, as to this fire, that the sprinkler system was not in operation and that the policy, with the protective safeguard endorsement, replaced the Mesirow binder as of October 29, 1992.

On July 2, 1993, Goldstein submitted a proof of loss for the second fire which claimed: replacement cost damages of $4,002,662; depreciation of $1,601,065; and

an actual cash value loss of $2,623,873.86. Fidelity denied the claim based on the by now well-known protective safeguards endorsement as well as other potential defenses not relevant here. Goldstein then demanded the $391,175 holdback for the October 5 fire in a letter of April 20, 1994. A few days later the property (which now was vacant land) was sold for $1,065,000. This suit followed a month later when Goldstein filed a four-count complaint against Fidelity in Illinois state court. Count I sought a declaration that the second fire was covered by the Fidelity policy. Goldstein argued that Fidelity was estopped from enforcing the protective safeguards endorsement with regard to the second fire because it failed to advance enough money on the first claim to enable Goldstein to comply with the endorsement. Count II alleged breach of contract based on Fidelity's denial of the second claim. Count III alleged breach of contract due to Fidelity's refusal to pay the full replacement cost on the first fire. Count IV sought attorney's fees and costs under the Illinois Insurance Code due to Fidelity's "vexatious and unreasonable delay" in settling the claim for the first fire.

Fidelity removed the case to federal court, invoking the court's diversity jurisdiction. After a year's worth of discovery, Goldstein filed a motion for summary judgment. It was at that time that the district court, as we noted, entered summary judgment, *sua sponte*, in favor of Fidelity on all counts.

■ Count I of Goldstein's complaint argued that Fidelity was estopped from enforcing the protective safeguards endorsement of the insurance policy, and therefore had a duty to pay Goldstein on his claim for the second fire. Goldstein offered two arguments in support of his estoppel claim. First, he argued he was misled when Fidelity charged him the lower "sprinklered" rate. Because Fidelity didn't charge him the highest rate, he claims, he didn't have to comply with the endorsement. In order for Goldstein to prevail on this claim, he would have to show that Fidelity's failure to charge the higher rate was materially misleading, and that he relied on the misrepresentation to his detriment. Given the undisputed facts, it is

not possible for Goldstein to make such a showing. It is absolutely beyond dispute that Goldstein was expressly informed, long before the second fire, that the property would not be covered if it did not comply with the protective safeguards clause in his insurance contract. The premium rate negotiated by the Mesirow Agency in August of 1992 is not material on this issue.

■ Goldstein's second argument in support of his estoppel claim is that he was prevented from complying with the endorsement by Fidelity's failure to advance more money to him on his claim following the first fire. Because Fidelity didn't advance enough money, he argues, it may not enforce the terms of the endorsement. This argument omits a crucial fact: it was Goldstein's responsibility, not Fidelity's, to ensure that Gold Realty was financially solvent. Goldstein's failure to secure the premises and install a sprinkler system after the first fire (or before it for that matter) was not a consequence of any action or inaction on the part of Fidelity. Also, Fidelity was under no obligation to advance funds on Goldstein's claim. Despite this, it is noted that Fidelity did in fact advance Goldstein $120,000 on the claim—not an insignificant sum. The problem was that Goldstein was not making his mortgage payments, and much of the money advanced went to the bank. Fidelity agreed to insure the Diversey property against loss or damage, not against the financial ups and downs of its owner. Goldstein's attempt to blame Fidelity for his lack of liquidity (he was going through a divorce at the time and had financial problems) misrepresents the nature of their contractual relationship.

■ Finally, Fidelity complied with the "loss payment" provision of the policy by paying the October 5 fire loss claim within 30 days after the parties reached agreement (the one brokered by Rozak and the Laske firm, the professional adjusters) on May 25, 1993. Until that time, legitimate and reasonable disputes existed as to matters like the cause of the fire, the applicability of the endorsement waiver, and the value of the compensable loss.

■ Count II of the complaint was a breach of contract claim. Goldstein alleged that Fidelity breached the terms of the insurance contract by denying his claim for losses resulting from the second fire. The terms of the contract clearly state that the property will not be covered if the sprinkler system is not in working order. In fact, it is hard to imagine that Fidelity could have expressed itself more clearly than it did in the endorsement. The parties agree that the sprinkler system was not in working order at the time of the second fire. If Fidelity was not estopped from enforcing the protective safeguards endorsement, as we agree with the district court that it was not, the second fire was simply not covered.

■ A second breach of contract claim was raised in Count III of the complaint. This time, Goldstein argued that Fidelity breached the terms of the insurance policy by not paying the depreciation holdback on fire number one. The insurance policy provides that Fidelity will not pay the depreciation holdback "[u]ntil the lost or damaged property is actually repaired or replaced; and ... [u]nless the repairs are made as soon as reasonably possible after the loss or damage." Again, the facts are undisputed. Goldstein never replaced or restored the property. The terms of the policy are clear and the district court was correct to grant summary judgment in favor of Fidelity on this issue.

■ The final count of the complaint sought costs and attorney's fees under section 155 of the Illinois Insurance Code, 215 ILCS 5/155 (1995), claiming that Fidelity vexatiously and unreasonably delayed paying the damage claim from the first fire. Section 215 provides that "a court may award attorney fees and specified penalties in an action against an insurer when the court determines, *in its discretion*, that the insurer's delay in settling a claim was unreasonable and vexatious considering the totality of the circumstances." *Garcia v. Lovellette*, 265 Ill. App.3d 724, 727, 203 Ill.Dec. 376, 639 N.E.2d 935 (1994) (emphasis added). The purpose of the statute is to "protect insured parties who are forced to expend attorneys' fees where the insurer refuses to pay under the terms of the policy." *Garcia*, 265 Ill.App.3d, at 728, 203 Ill.Dec. 376, 639 N.E.2d 935 (quoting *Stamps v. Caldwell*, 133 Ill.App.2d 524, 273 N.E.2d 489 (1971)). The question of whether Fidelity acted vexatiously and unreasonably

was within the sound discretion of the district court, and will only be disturbed upon a finding that that discretion was abused. *Smith v. Equitable Life Assurance Soc'y of the United States,* 67 F.3d 611, 618 (7th Cir.1995).

██ In determining as a matter of law that Fidelity did not act vexatiously or unreasonably in paying Goldstein's claim when it did, the district court had before it a number of undisputed facts. Both parties agree on the essentials: the date the loss occurred; the date the investigation began; the date Fidelity discovered that the binder waived the protective safeguard provision, lessening the need for further investigation; the dates and amounts of Fidelity's advances on the claim; and the date Goldstein was paid. And as we just noted, the policy required Fidelity to remit payment on a claim within 30 days of reaching an agreement as to the amount of loss. It is undisputed that Fidelity paid within the contractual time period. On these undisputed facts, the district court's finding that Fidelity acted neither unreasonably nor vexatiously was correct.

The decision of the district court is affirmed.