129 F.3d 119
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
r. Leander Jennings and Susan JENNINGS, Plaintiffs-Appellants,
v.
FORD MOTOR COMPANY, Defendant-Appellee.
 No. 96-4078.
 United States Court of Appeals, Seventh Circuit.
 Argued June 2, 1997
Decided October 3, 1997.
 
 United States District Court for the Eastern District of Wisconsin, No. 96 C 57; John W. Reynolds, Judge.
 Before BAUER, CUDAHY and KANNE, Circuit Judges.
 
 ORDER
 
 1
 On March 7, 1995, Dr. Leander Jennings and Susan Jennings leased a 1995 Lincoln Mark VIII automobile from Heiser Lincoln Mercury, an authorized Ford Motor Company dealer located in Milwaukee, Wisconsin. The lease was for a term of two years, expiring March 7, 1997. The car had a four-year/50,000 mile written warranty.
 
 
 2
 While driving the car on October 23, 1995, Mrs. Jennings pressed the rear window defroster button. The rear window area went up in flames, and the rear window shattered. There were no injuries. The car was subsequently towed to Heiser Lincoln Mercury. From October 23 until December 9, Dr. Jennings and his wife had the use of a loaner vehicle provided by Heiser.
 
 
 3
 While seeking to have their car repaired, the Jenningses dealt primarily with the following people: Tim Kollmeyer, a Heiser service manager; Chris Meyer, the general manager of Heiser; and Robin Tansil, a Ford consumer affairs specialist. The following is a chronology of events that occurred in 1995.[1]
 
 
 4
 March 7 The lease commences.
 
 
 5
 October 23 The Jenningses' car catches on fire.
 
 
 6
 Late October Kollmeyer informs Dr. Jennings that Ford will not repair the car under its warranty and that the Jenningses' personal fire insurer should be contacted to pay for the repairs.[2]
 
 
 7
 November 7 Tansil faxes a memorandum and form release to Kollmeyer. The memo states that repair is authorized, but only if the release[3] is signed.
 
 
 8
 Dr. Jennings declines to sign the release.
 
 
 9
 November 9 Tansil faxes the revised release to Kollmeyer, which Dr. Jennings signs.
 
 
 10
 Tansil informs Kollmeyer by telephone that the release is unacceptable because it has not been notarized.
 
 
 11
 Kollmeyer telephones Dr. Jennings to inform him that Ford had refused the release because it was not notarized.
 
 
 12
 Dr. Jennings declines to sign another release.
 
 
 13
 November 27 The Jenningses retain counsel.
 
 
 14
 Meyer contacts the Jenningses to inform them of Ford's decision to replace the vehicle.
 
 
 15
 Jenningses' counsel faxes a letter to Tansil demanding replacement of the car.
 
 
 16
 Tansil then sends a letter to the Jenningses offering to replace the car.
 
 
 17
 November 28 Jenningses' counsel faxes a letter[4] to Tansil offering to settle the dispute for a replacement car and the payment of $1,010 in attorney fees.
 
 
 18
 Meyer telephones Mrs. Jennings and informs her that Ford is willing to replace the car. Mrs. Jennings replies that it is too late and that their counsel will handle the matter.
 
 
 19
 December 4 Jenningses' counsel faxes a letter to Tansil, now requesting that the repairs be completed and the car returned immediately to Dr. Jennings.
 
 
 20
 December 5 Jenningses file their complaint, claiming that Ford's response to the Jenningses' vehicle troubles violated Wisconsin lemon law § 218.015.
 
 
 21
 December 7/8 Meyer telephones Mrs. Jennings and informs her that the loaner vehicle that the Jenningses had been using must be returned.
 
 
 22
 December 9 Heiser picks up the loaner vehicle from the Jenningses home.
 
 
 23
 December 19 Jenningses' counsel faxes Meyer demanding that the car be immediately repaired within three days, or the Jenningses will pay the remaining balance on the car and remove it from Heiser.
 
 
 24
 December 20 The Jenningses' car is repaired.
 
 
 25
 December 21 A partial settlement agreement is executed. The settlement agreement states that
 
 
 26
 Ford will provide the Jennings[es] with a new comparable Lincoln Mark VIII. Ford will also reimburse the Jennings[es] for any collateral costs, including but not limited to, any deductible paid or to be paid by the Jennings[es] in regard to the repair work of their 1995 Lincoln Mark VIII which is the subject of this suit, and any rental car fees paid by or billed to the Jennings[es] in connection with the fire to their 1995 Lincoln Mark VIII.... [T]he plaintiffs agree that the above consideration will be considered the equivalent of the amount the consumer paid under the written lease plus any sales tax and collateral costs, less a reasonable allowance for use, as set forth in § 218.015(2)(b)(3), which section otherwise would have required a "refund."[5] Ford's position is that the Jennings[es] are entitled, to keep the new comparable replacement Lincoln Mark VIII for the remainder of the lease term under the existing lease agreement. The Jennings[es]' position is that they are entitled, under the present circumstances, to double damages, attorney's fees, costs and the other remedies under § 218.015(7). The parties recognize that there are other open issues and claims, including a dispute over attorneys' fees. The parties have agreed to hold off resolving the open issues and claims until after the first of the year.
 
 
 27
 Dr. and Mrs. Jennings brought this action in the Waukesha County Circuit Court alleging that Ford violated the Wisconsin Lemon Law (specifically Wis. Stat. §§ 218.015(2)(a) and (b)), as well as Wisconsin's Warranty Law. The complaint also contained a request for punitive damages. On the basis of diversity Ford removed the case to the United States District Court for the Eastern District of Wisconsin. The Jenningses then moved for partial summary judgment with regard to the Lemon Law and Warranty Claims. The district court denied the Jenningses' summary judgment motion and, citing Goldstein v. Fidelity and Guar. Ins. Underwriters, Inc., 86 F.3d 749, 750-751 (7th Cir.1996), granted summary judgment in favor of Ford although Ford had not moved for summary judgment. The case was dismissed in its entirety.
 
 ANALYSIS
 A. Standard of Review
 
 28
 We utilize a de novo standard of review in analyzing a district court's grant of summary judgment. Campbell v. Towse, 99 F.3d 820, 826 (7th Cir.1996). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," Anderson, 477 U.S. at 247, nor the demonstration of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will sufficiently demonstrate a genuine issue of material fact. In that regard, the "mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient." Anderson, 477 U.S. at 252.
 
 
 29
 B. The General Provisions of the Wisconsin Lemon Law
 
 
 30
 The Wisconsin Lemon law applies to new motor vehicles for the period of one year or the length of the vehicle's warranty, whichever is sooner. Wis. Stat. § 218.015(2)(a). Under the Lemon Law, a vehicle is considered a "lemon" if it has a defect which substantially impairs the use, value or safety of a motor vehicle, and it is out of service for thirty days or subject to repair four times for the same defect. Id. § 218.015(1)(f) and (h). If a reasonable attempt to repair the defect is unsuccessful, a non-lessee consumer gets his or her choice of a new vehicle or a refund. Id. § 218.015(2)(b). In lease situations, the manufacturer must accept return of the leased motor vehicle, refund the current value of the lease and refund the amount the consumer paid under the lease (plus sales tax and collateral costs, less a reasonable allowance for use). Id. § 218.015(2)(b)(3)(a). In either a purchase or a lease situation, the manufacturer has thirty days to provide a refund or a new vehicle. Id § 218.015(2)(c) and (cm). A consumer who prevails in an action to recover for damages arising from violation of the lemon law is entitled to double his or her pecuniary loss, as well as costs and reasonable attorney fees. Id. § 218.015(7).
 
 C. Section 218.015(2)(b) Claim
 
 31
 Section 218.015(2)(b) states that "[i]f after a reasonable attempt to repair the nonconformity is not repaired, the manufacturer shall carry out the requirement under ... [ § 218.015(2)(b)(2) or § 218.015(2)(b)(3) ], whichever is appropriate." Wis. Stat. § 218.015(2)(b). Section 218.015(2)(b)(2) applies to purchased cars while § 218.015(2)(b)(3) applies to leased cars. Section 218.015(2)(b)(3), as described above, generally provides that the manufacturer must accept return of the leased motor vehicle, refund the current value of the lease and refund the amount the consumer paid under the lease (plus sales tax and collateral costs, less a reasonable allowance for use). Id. § 218.015(2)(b)(3)(a).
 
 
 32
 The Jenningses argue that "refusal to provide full Section [218.015(2)(b) ] Lemon Law remedies ... established a violation of Section [218.015(2)(b) ] of the Lemon Law entitling the Jennings[es] to double damages and attorney's fees." Appellant's. Br. at 20. Specifically, the Jenningses argue that "the only remedy for a leased 'lemon' is reimbursement of the consumer's lease payments (less a mileage offset) and termination of the lease." Id. While it is true that a party who leases a lemon is afforded a refund of the amount they paid under the lease and collateral costs, the Jenningses did not ask for a refund of any amounts paid under the lease. Instead, on December 21, 1995, the Jenningses entered into a partial settlement agreement in which the they agreed that Ford would provide them with a "new comparable Lincoln Mark VIII" and pay "any collateral costs" in return for an agreement that Ford's consideration would satisfy the Lemon Law's refund requirements under § 218.015(2)(b)(3). The Jenningses cite no case law which suggests that this partial settlement agreement can be ignored. There is no apparent reason why the Jenningses should not be held to their end of this partial settlement agreement as long as Ford complied with its end of the bargain.
 
 
 33
 It is undisputed that Ford delivered a replacement car to the Jenningses as part of the agreement. It is also undisputed that the Jenningses received compensation from Ford for certain collateral costs, i.e., the Jenningses received the insurance deductible towards the repair of their damaged car, and they received full payment for their rental car bill which accrued while they waited for Ford to provide a replacement vehicle. Because Ford complied with their part of the partial settlement agreement, we must disallow the Jenningses' claim that Ford violated the Lemon Law by failing to provide reimbursement to the Jenningses by a refund of lease payments (less a mileage offset) and termination of the lease. Although the refund did not come in the form of a cash payment, the Jenningses agreed that they would accept a new, comparably equipped vehicle in satisfaction of the "refund requirement" under § 218.015(2)(b)(3). Therefore there is no § 218.015(2)(b)(3) Lemon Law violation. Accordingly, the district court properly granted summary judgment in favor of Ford regarding the Jenningses' § 218.015(2)(b) claim.
 
 D. Section 218.015(2)(a) Claim
 Section 218.015(2)(a) states that
 
 34
 [i]f a new motor vehicle does not conform to an applicable express warranty and the consumer reports the nonconformity to the manufacturer, the motor vehicle lessor or any of the manufacturer's authorized motor vehicle dealers and makes the vehicle available for repair before the expiration of the warranty or one year after first delivery of the motor vehicle to a consumer, whichever is sooner, the nonconformity shall be repaired.
 
 
 35
 Id. § 218.015(2)(a). This subsection "protects the consumer from those instances in which the consumer is unable to establish the 'reasonable attempt to repair' necessary under sec. 218.015(2)(b) ... but can show that the dealer has not, cannot, or will not repair a nonconformity brought to its attention during the warranty period." Vultaggio v. General Motors Corp., 429 N.W.2d 93, 99 (Wis.Ct.App.1988). The Jenningses argue that by delaying repair of their car until Dr. Jennings executed a release,[6] Ford in effect refused to repair the Jenningses' vehicle and thus violated § 218.015(2)(a).
 
 
 36
 As previously stated, § 218.015(2)(a) imposes a duty on a manufacturer to repair a reported nonconformity. See Vultaggio, 429 N.W.2d at 99. Our review of the record, however, does not indicate that Ford necessarily refused to repair the Jenningses' vehicle. Ford did ask, on two separate occasions on November 9, that Dr. Jennings sign a release before Heiser began repairs on the car. On November 9, Dr. Jennings signed a release. Ford, however, would not accept this release because it was not notarized. Ford asked Dr. Jennings to sign a second, properly notarized release. Dr. Jennings refused to sign this second release and therefore Ford did not begin repair of the Jenningses' vehicle at that time. Ford did, however, have the vehicle repaired as of December 20. Although it took Ford almost six-weeks to make the repaired vehicle available, we believe that this fact is irrelevant because Ford's November 9 requirement that Dr. Jennings sign a release did not constitute a refusal to repair. Accordingly, we hold that Ford did not violate § 218.015(2)(a).
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 This event chronology is taken from the district court's opinion
 
 
 [2]
 The record reveals that there is some dispute about this finding of fact. This finding of fact, although helpful, is immaterial to our decision
 
 
 [3]
 The release establishes that Ford will repair the Jenningses' car in exchange for the Jenningses' release of all claims against Ford for the damages, expenses incurred, and attorney's fees accrued in connection with damage to the rear window defrost system
 
 
 [4]
 The letter states, in pertinent part:
 Dr. Jennings and I only want this claim to be resolved in a fair and efficient manner. We will consider resolving this claim with a new, comparable and comparably-equipped vehicle without cost, with a new two-year lease on the same terms, provided that Ford also pay the attorney's fees and costs to date. To date, I have invested $1,010 (5.2 hours X $175/hour plus $100 in estimated costs). We are also prepared to file litigation and seek the full Lemon Law rights.
 
 
 [5]
 Section 218.015(2)(cm)(3) provides that once a refund is given, the lease against the consumer may not be enforced. Wis. Stat. § 218.015(2)(cm)(3)
 
 
 [6]
 On November 9, 1995, Ford sent a memo to Heiser requiring that Dr. Jennings sign a release before Heiser could begin repairing the Jenningses' car. That memo stated, in pertinent part, that "Dr. Jennings must sign this release before you can begin repairs."