OPINION OF THE COURT

STAPLETON, Circuit Judge:
Michael LaFata and the class he represents assert ERISA claims under § 502(a)(1)(B), 29 U.S.C.S. § 1132, and § 510, 29 U.S.C.S. § 1140. The District Court entered summary judgment against them, and they now appeal. We will affirm.
I. The Transactions
Prior to the events giving rise to this controversy, Raytheon Engineers & Constructors (“RE & C”), which employed Michael LaFata (“LaFata”) and members of his class, was a wholly-owned subsidiary of Raytheon Engineers & Constructors International, Inc. (“RECI”), which was, in turn, a wholly-owned subsidiary of Raytheon Company (“Raytheon”).
As RE & C employees, LaFata and other class members were the beneficiaries of RE & C’s Termination of Employment Policy (“the Plan”) that provided for severance benefits.[1] The Plan delineated two categories of termination — voluntary and involuntary. The Plan classified four types of involuntary termination: layoff, release, reorganization, and discharge. Section 10 of the Plan provided for severance pay to full-time employees whose terminations were classified as layoff, release, or reorganization (but not for “discharge”). Each of these terms is defined by the Plan:
A lay-off is “an involuntary termination of employment with the Company when, because of economic or organizational reasons, a reduction of force is required.”
A release is “an involuntary termination of employment with the Company when it is determined that an employee cannot, through no fault of their own, perform the work assigned.”
A re-organization is an “involuntary termination of employment due to a change in Company structure.”
App. at 651a-652a.
In April of 2000, Raytheon, RECI, and Morrison Knudsen Corporation (“MK”) *261 entered a Stock Purchase Agreement (“the SPA”), calling for MK to purchase from RECI all of its stock in RE & C, along with other specified RECI corporate assets including the stock of other RECI subsidiaries. As soon as MK acquired all of the stock of RE & C on July 7, 2000, its Board of Directors adopted a resolution merging RE & C into itself. Certificates effectuating the merger were filed in Ohio on July 7, 2000 and Delaware on July 10, 2000. This merger was not spoken of in the SPA. MK did commit itself in the SPA to employ employees of RE & C after the closing date if they were no longer employed by RE & C.
LaFata and the class he represents here seek to recover severance benefits from Raytheon and RECI, and, accordingly, we have occasion to address only the liability of those defendants. MK and the remaining defendants have entered a settlement agreement with LaFata and his class and are not parties to this appeal.
II. The Section 502(a)(1)(B) Claim
ERISA Section 502(a)(1)(B) authorizes any person to bring a civil action “to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.” LaFata here seeks to recover termination benefits under Section 10 of the Plan. He alleges that he and a class of RE & C employees suffered a termination of employment on July 7, 2000, when RE & C’s stock was sold to MK under the SPA and that this alleged termination entitled them to severance pay.[2]
The initial issue for resolution is whether the sale of RE & C stock to MK constituted “an involuntary termination of employment due to a change in company structure.” Clearly it did not. There was no “change in [RE & C’s] Company structure” occasioned by that sale.
The District Court concluded that LaFata had tendered sufficient evidence to permit a trier of fact to conclude that he experienced a “termination of employment” on July 7, 2000. If such a termination occurred on that date, however, it was the result of the merger of RE & C into MK, not the sale of the RE & C stock.[3] This is significant for two reasons. Recognizing that RECI and Raytheon played no role in the decision to merge, LaFata has fashioned two theories in an effort to make them legally responsible for the conduct of others. Both theories fail to take into account that the merger was responsible for any change in corporate structure that may have occurred.
LaFata’s first theory is predicated on Section 9.3(d) of the SPA. That section provides:
The Sellers shall be responsible for amounts payable ... for severance, change of control, or similar amounts payable to any Assumed Employees and arising solely from the consummation of the transactions contemplated by this Agreement.
App. at 69; 490a. LaFata insists that he and the members of his class are third party beneficiaries of this provision. We are unpersuaded.
*262 We find no ambiguity in § 9.3(d). It applies only to “amounts payable ... for severance ... and arising solely from, the consummation of the transactions contemplated by” the SPA. As we have noted, so far as here relevant, the only transactions contemplated by the SPA were sales of RE Cl’s stock in its subsidiaries. It simply does not speak of a merger of RE & C into MK.
Moreover, LaFata’s argument overlooks the provision of the SPA which speaks directly to third party beneficiaries. Section 16.9 provides:
Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any person, firm, or corporation, except Sellers and the Buyer and as provided in Article 13 with respect to the Buyer Indemnified Parties and the Seller Indemnified Parties, any rights or remedies under or by reason of this Agreement.
App. at 17a (footnotes omitted). Section 13.1 defines the Buyer Indemnified Parties as the “Buyer, its Subsidiaries and affiliates (and each of their respective directors, officers, shareholders, agents and employees.” Section 13.2 defines the Seller Indemnified Parties in complementary fashion.
We find this provision unambiguous as well. The parties clearly intended no third party beneficiaries “except as otherwise expressly provided” in the SPA.[4] And it is equally clear that the provision under which LaFata claims to be entitled to severance pay, Section 9.3(d), does not expressly confer third party beneficiary status on persons in LaFata’s position.
LaFata’s second theory imposing liability on Raytheon and RE Cl for the conduct of others is described as the “Single Employer or Integrated Enterprise Standard of Liability” which is said to be applicable “for purposes of federal employment statutes”:
A “single employer” relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a “single employer.” The question in the “single employer” situation, then, is whether the two nominally independent enterprises, in reality, constitute only one integrated enterprise.
N.L.R.B. v. Browning-Ferris Industries of Pennsylvania, Inc., 691 F.2d 1117, 1122 (3d Cir.1982) (emphasis in original).
We need not consider whether this “single employer” doctrine is applicable in the context of a federal employment statute like ERISA where employer participation is voluntary. Even if it be deemed applicable to liability under ERISA, this would not help LaFata. We may assume that he has tendered sufficient evidence to permit a trier of fact to conclude that Raytheon, RE Cl and RE & C were a single employer prior to the sale of RECI’s stock in RE & C. Nevertheless, the record will not support a conclusion that RE & C was an integrated part of Raytheon or RE Cl after it was wholly owned by MK. As the subsequent events of July 7, 2000, demonstrate, RE & C was owned and controlled by MK *263 as soon as the sale of its stock closed. This fact, together with the fact that the sale did not give rise to severance pay rights, means that Raytheon and RECI are not responsible to LaFata and his class for severance pay.
III. The Section 510 Claim
Section 510 of ERISA provides:
It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.
In support of his contention that Raytheon and RECI violated § 510 by “discharging” and “discriminating” against him, LaFata points to evidence which he believes would support a finding that the sale of the business of RE & C was structured as a sale of stock rather than a sale of assets because Raytheon and RECI believed that a sale of stock would not trigger severance benefits under the Plan. We will assume for present purposes that the current record would permit such a finding. We agree with the District Court, however, that no violation of § 510 occurred.
These are the elements of a meritorious § 510 claim: “(1) proscribed employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.” Gavalik v. Continental Can Co., 812 F.2d 834, 852 (3d Cir.1987). To satisfy the first element, the defendant must have engaged in an act prohibited by § 510; “[t]here must be some act in furtherance of an employer’s desire to interfere with an employee’s rights to pension benefits.” Id. The only prohibited acts relevant to this appeal are “discharge” and “discrimination.”
We agree with the District Court that Raytheon and RECI cannot be said to have “discharged” LaFata. As the District Court observed, “[a]ll Raytheon and RECI did was to sell stock.” App. at 19a. Under any view of these facts, LaFata was not discharged by that sale and Raytheon and RECI cannot be said to have “discharge[d]” LaFata subsequent to the stock sale because they no longer owned RE & C at that point. If LaFata was “discharge[d],” it could only have been by RE & C or its new owner.
LaFata does not satisfactorily explain how Raytheon and RECI “discriminated” against him and the members of his class and, like the District Court, we perceive no discrimination. The sale of RECI’s stock in RE & C did not discriminate between RE & C employees or between classes of RE & C employees; rather, it treated all employees equally. Phillips v. Amoco Oil Co., 799 F.2d 1464 (11th Cir.1986). (“[A]s the entire business was sold in this case, there could not have been discrimination among employees” for purposes of § 510). Where all employees are treated equally, “the sale of an ongoing business is not prohibited by section 510.” Blaw Knox Retirement Income Plan v. White Consol. Indus., Inc., 998 F.2d 1185 (3d Cir.1993).[5]
*264 IV. Conclusion
The judgment of the District Court will be affirmed.

. Some of the constituent benefit programs participated in by LaFata, including the Termination of Employment Policy, were incorporated into the Welfare Benefit Plan which operated as an umbrella plan for other RE & C employee plans. The Welfare Benefit Plan confers upon the "Plan Administrator ... absolute discretion to construe and interpret any and all provisions of the Plan and the Constituent Benefit Programs.” The Termination of Employment Policy does not make reference to the Welfare Benefit Plan, however, and for that reason and others, LaFata insists that we should not defer to the Plan Administrator’s interpretation of the severance pay provisions. Raytheon and RECI, on the other hand, argue that the Plan Administrator’s denial of severance pay can be overturned only if arbitrary and capricious. We need not resolve this conflict because we find the relevant provisions of the Plan unambiguous in the context of the situation presented here.

. "Severance pay” as used herein includes accrued vacation pay.

. Because we conclude that any "termination of employment due to a change in Company structure” occurred after the sale of RE & C stock, we have no occasion to address whether the District Court erred in holding that the record would support a finding that there was a "termination of employment” during the course of the events referenced in LaFata’s complaint.

. Under New York law, the applicable state law here, a third party is entitled to only those rights which the original parties to the contract intended the third party to have, 22 N.Y. Jur. Contracts § 302; Leavitt-Berner Tanning Corp. v. American Home Assurance Co., 129 A.D.2d 199, 516 N.Y.S.2d 992, 995 (N.Y.App.Div.1987); see also 981 Third Ave. Corp. v. Beltramini, 108 A.D.2d 667, 485 N.Y.S.2d 535, 538 (1985) ("[I]t is often stated by the courts that the contract must have been intended for the benefit of the third person in order to entitle him to enforce same.”).

. In Eichom v. AT & T Corp., 248 F.3d 131 (3d Cir.2001), the sole issue presented to the Court in connection with the § 510 claim was whether the plaintiffs had tendered sufficient evidence to permit a finding that the defendants "had the specific intent to interfere with the ... employees’ pension benefit rights.” Id. at 149. The defendants did not argue that the evidence would not support a finding that they discriminated. This may well have been because the no-hire agreement which effectively cancelled the plaintiffs’ pen *264 sion bridging rights discriminated against former Paradyne employees whose compensation exceeded $50,000.