United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 30, 2006**

Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 21, 2006

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 06-20632

_____

HALLIBURTON COMPANY BENEFITS COMMITTEE, In Its Capacity as Plan
Administrator of the Halliburton Energy Services, Inc. Welfare
Benefits Plan, including its constituent benefit program, the
Dresser Retiree Life and Medical Program; HALLIBURTON CO;
HALLIBURTON ENERGY SERVICES INCORPORATED WELFARE BENEFITS PLAN

Plaintiffs - Appellants

v.

JAMES GRAVES; PHIL GRIFFIN; PAUL M BRYANT, individually and as
representatives of a requested class of all similarly situated
persons

Defendants - Appellees

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before KING, STEWART and DENNIS, Circuit Judges.

KING, Circuit Judge:

This class action, brought under the Employee Retirement
Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (2000)
("ERISA"), arises from the September 1998 merger of Dresser
Industries, Inc. into a wholly owned subsidiary (Halliburton
N.C., Inc.) of Halliburton Company pursuant to the terms of a
merger agreement among the three companies and the effect of the
merger agreement on the Dresser Retiree Medical Program, an

employee welfare benefit plan under 29 U.S.C. § 1002(1).  As part of the merger agreement, Halliburton agreed to maintain the Dresser Retiree Medical Program for eligible participants, except to the extent that any modifications to the program are consistent with changes in the medical plans provided by Halliburton for similarly situated active employees.  In November 2003, Halliburton amended three subplans of the Dresser Retiree Medical Program "to align the benefits provided to the participants in the three subplans more closely with the benefits provided to other Halliburton retirees."  Halliburton did not make similar modifications to the plans for its own similarly situated active employees.

After receiving written complaints from at least three affected Dresser retirees challenging the validity of the November 2003 amendments in light of the merger agreement, Halliburton filed this action against the Dresser retirees in the district court, seeking class certification of all participants in the Dresser Retiree Medical Program and declarations that the November 2003 amendments are valid and that the merger agreement does not limit Halliburton's right to amend or terminate the Dresser retiree program.  The parties filed cross-motions for summary judgment, and on December 20, 2004, the district court granted partial summary judgment in favor of the Dresser retirees.  The district court concluded that the merger agreement modified the Dresser Retiree Medical Program and that Halliburton

2

must maintain the program for eligible participants and may amend or terminate the program only if it makes the same changes to the programs for its similarly situated active employees. On June 26, 2006, the district court certified its order pursuant to 28 U.S.C. § 1292(b). We granted Halliburton's unopposed petition for permission to appeal, and for the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

In 1998, Dresser Industries, Inc. ("Dresser"), a Delaware corporation in the oilfield services business, merged with Halliburton N.C., Inc. ("Halliburton N.C."), a newly formed Delaware corporation and wholly owned subsidiary of Halliburton Company ("Halliburton"), also a Delaware corporation in the oilfield services business. The merger was accomplished under the Delaware General Corporation Law. Prior to the merger, Halliburton and Dresser separately had established welfare benefit programs for employees and retirees. The Halliburton Company Welfare Benefits Plan ("Halliburton Plan") provided very limited medical benefits for its retirees. On January 1, 1994, Halliburton had amended its retiree program to eliminate medical benefits for those retirees over the age of sixty-five who were Medicare-eligible, unless the retiree had reached the age of sixty-five by January 1, 1994. For the latter retirees, the

3

Halliburton Plan provided only a prescription drug benefit of $22 per month and eliminated all other medical benefits.

The retiree medical benefits provided by the Dresser Retiree Medical Program were significantly greater than those provided by the Halliburton Plan at the time of the merger. The Dresser Retiree Medical Program consisted of separate subplans that provided medical benefits to different groups of Dresser retirees. It was governed by Dresser's umbrella plan for welfare benefits, the Dresser Industries, Inc. Welfare Benefit Plan, Plan 750 ("Dresser Plan 750").[1] On January 1, 1993, Dresser had amended the Dresser Retiree Medical Program to exclude additional

---

[1] The most recent iteration of Dresser Plan 750 is the 1995 version. The summary plan description in effect on the date of the merger was "Your Benefits Handbook 1997, Plan 750 For Non-Union Employees and Retirees, Effective January 1, 1997" with minor changes found in "Your Dresser Benefits--1998/Enrollment Information Retiree Union-Free Version."

Dresser Plan 750 also governed Dresser's other welfare benefit programs, including the Dresser Executive Deferred Compensation Plan, the Dresser Executive Life Insurance Program, the Dresser Supplemental Executive Retirement Plan, and the pension equalizer payments under the Dresser Retirement Savings Plan.

In their brief, the Retirees allude to provisions in the merger agreement affecting these other welfare benefit programs; however, our jurisdiction applies to the order certified to this court, and that order is limited to the merger agreement's effect on the Dresser Retiree Medical Program. See 28 U.S.C. § 1292(b) (2000); see also Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 205 (1996) ("As the text of § 1292(b) indicates, appellate jurisdiction applies to the order certified to the court of appeals . . . . [b]ut the appellate court may address any issue fairly included within the certified order because 'it is the order that is appealable, and not the controlling question identified by the district court.'") (quoting 9 J. MOORE & B. WARD, MOORE'S FEDERAL PRACTICE ¶ 110.25[1] (2d ed. 1995)).

retirees over the age of sixty-five, except for a defined group of so-called "grandfathered" employees who remained eligible for full medical benefits under the program after they turned sixty-five.[2]  There were approximately 5500 participants in the Dresser Retiree Medical Program when Halliburton and Dresser merged in 1998.  Since the merger, the number of grandfathered employees has been declining, and it is these employees who are the members of the defendant class.[3]  Dresser Plan 750 specifically reserved the right to amend or terminate any of its welfare benefit plans, including the Dresser Retiree Medical Program.

In preparation for the merger between Halliburton and Dresser, senior management of the two companies, along with their financial and legal advisors, met on February 20-22, 1998, to negotiate the terms of the merger agreement.  At a meeting on February 20, the parties discussed Dresser Plan 750, including, inter alia, medical benefits for Dresser retirees.[4]  Mark Vogel,

---

[2]  The "grandfathered" employees fell into three categories: (1) existing retirees with coverage; (2) active employees who met the age and service requirements as of January 1, 1993; and (3) specified active employees who could "grow in" to retiree benefits if they completed the requisite years of service before retiring.  The first group had approximately 5000 employees, and the second and third groups had approximately 500 employees combined.

[3]  At oral argument, counsel for the Retirees estimated that as of May 3, 2006, the Dresser Retiree Medical Program had between 3000-4000 participants.

[4]  David Lesar, President and Chief Operating Officer of Halliburton, Lester Coleman, Executive Vice President and General Counsel of Halliburton, Donald Vaughn, President and Chief

an attorney with Weil, Gotshal & Manges, LLP, representing Dresser, indicated in his notes from the meeting that David Lesar ("Lesar"), then President and Chief Operating Officer of Halliburton, "agreed to protect all [Dresser] salaried employees who were grandfathered with respect to [the] old retiree medical plan at no less benefits than active employees." The notes from the meeting were delivered to Lesar and Lester Coleman ("Coleman"), Executive Vice President and General Counsel of Halliburton, at 7:00 p.m. that same day.

Shortly after the negotiations concluded, on February 25, 1998, the companies executed the Agreement and Plan of Merger (the "merger agreement" or "agreement") by and among Halliburton, Halliburton N.C., and Dresser. On September 29, 1998, the effective date of the agreement, Halliburton N.C. merged with and into Dresser. The agreement specified that "[a]s a result of the Merger, the separate corporate existence of [Halliburton N.C.] shall cease and [Dresser] shall continue as the Surviving Corporation." It further explained that "all the property, rights, privileges, powers and franchises of [Halliburton N.C.] and [Dresser] shall vest in the Surviving Corporation, and all debts, liabilities and duties of [Halliburton N.C.] and [Dresser] shall become the debts, liabilities and duties of the Surviving

---

Operating Officer of Dresser, and Paul Bryant, Vice President of Human Resources for Dresser, were among those present at the meeting.

Corporation." Under the terms of the agreement, Dresser's shareholders received one share of newly issued Halliburton common stock for each share of Dresser common stock.

The agreement itself recited that the respective boards of directors of Halliburton and Dresser had approved the merger. The agreement was signed by Lesar on behalf of Halliburton and William Bradford ("Bradford"), then Chairman and Chief Executive Officer of Dresser, on behalf of Dresser. On June 25, 1998, the Halliburton and Dresser shareholders approved the agreement at separate meetings. The agreement was to be governed by and construed in accordance with Delaware General Corporation Law.

This appeal primarily concerns three provisions in the merger agreement, two of which deal with employee benefit plans and one of which addresses the parties in interest to the merger agreement. The two provisions concerning employee benefit plans are found in section 7.09, entitled "Assumption of Obligations to Issue Stock and Obligations of Employee Benefits Plan; Employees." First, section 7.09(g)(i) states that:

> (g) [Halliburton] shall and shall cause the Surviving Corporation and each Subsidiary of the Surviving Corporation to take all corporate action necessary to:
> (i) maintain with respect to eligible participants (as of [September 29, 1998]) the [Dresser] retiree medical plan, except to the extent that any modifications thereto are consistent with changes in the medical plans provided by [Halliburton] and its subsidiaries for similarly situated active employees . . . .

Following this provision, section 7.09(h) provides that:

7

Subject to Section 7.09(g), until the third anniversary of the Effective Time [of the merger agreement] (the "Benefits Maintenance Period") [Halliburton] shall and shall cause the Surviving Corporation and each Subsidiary of the Surviving Corporation to provide each employee of [Dresser] or any of its Subsidiaries at the Effective Time ("Company Participants") with employee benefits and compensation after the Effective Time that are substantially comparable to similarly situated employees of [Halliburton] and its Subsidiaries.

The parties also included a section covering the parties in interest to the merger agreement. Section 10.07 states that the agreement shall inure solely to the benefit of each party and that nothing in the agreement is intended to confer upon any other person any right, benefit, or remedy. It also provides an exception to its general prohibition on third-party beneficiaries:

Notwithstanding the foregoing and any other provision of this Agreement, and in addition to any other required action of the Board of Directors of [Halliburton] a majority of the directors . . . serving on the Board of Directors of [Halliburton] who are designated by [Dresser] pursuant to Section 7.13 shall be entitled during the three year period commencing at the Effective Time (the "Three Year Period") to enforce the provisions of Sections 7.09 and 7.13 on behalf of the Company's officers, directors and employees, as the case may be. Such directors' rights and remedies under the preceding sentence are cumulative and are in addition to any other rights and remedies that they may have at law or in equity, but in no event shall this Section 10.07 be deemed to impose any additional duties on any such directors. . . .

Following the merger, the Halliburton Plan and Dresser Plan 750 were separately maintained. Because the welfare plans differed in many respects, proper administration of the plans posed a significant challenge. For Dresser Plan 750, this

8

responsibility fell, at least in part, on Paul Bryant ("Bryant"), the former Dresser Vice President of Human Resources who became the Halliburton Shared Services Vice President of Human Resources after the merger.  On May 14, 1999, almost eight months after the effective date of the merger, Bryant submitted a memorandum and a notebook to senior management, including, inter alios, Bradford, Coleman, and Celeste Colgan ("Colgan"), Halliburton's Vice President of Administration.  The memorandum and the notebook, entitled "Dresser Legacy--Employee Pay and Benefit Obligations, Merger Agreement Section 7.09(g)," were prepared, and, in the case of the memorandum, signed, in the regular course of Bryant's employment as Vice President at Halliburton.  In the memorandum, Bryant stated that he had prepared the notebook "to assist in complying with the Merger Agreement, Section 7.09(g)."  Bryant also noted that "[s]ince [he] was the primary figure from Dresser dealing with pay and benefit matters at the Merger negotiations, [he] thought it would be helpful to provide this material before [he] retired."  With regard to the Dresser Retiree Medical Program and section 7.09(g)(i), the provision in the merger agreement concerning the retirees' program, Bryant explained that:

> During the merger negotiations, Dresser wanted to ensure that the Dresser Retiree Medical plan was kept similar to the current plan but recognized that the future was unpredictable.  Thus, wording was included that gave Halliburton the ability to make changes to the Dresser Retiree Medical plan as long as the same changes were being made to active employees.  For example, if business

9

conditions caused Halliburton to increase active employee contributions 20% and raise the minimum deductible to $1,000, the same actions could be taken to the Dresser Retiree Medical plan participants.

There is no indication in the record that Halliburton or any senior management of Halliburton receiving the memorandum and notebook disputed Bryant's interpretation of the Dresser Retiree Medical Program or that administration of the retiree program was being carried out contrary to Bryant's interpretation. Rather, Halliburton's correspondence indicates that it was mindful of its obligations to Dresser retirees under the merger agreement. For example, on February 16, 1999, Colgan wrote a letter to Clint Ables ("Ables"), one of the Dresser retirees, in response to Ables's request for a copy of the Dresser Summary Plan Description for the retiree medical program. Colgan explained that although she was enclosing a copy of the 1997 handbook--the version existing before the 1998 merger--that version "contains the benefit information pertaining to coverage currently extended to Dresser 'grandfathered' retirees." She also noted that Halliburton "is mindful of its obligation to 'maintain with respect to eligible participants . . . [Dresser's] retiree medical plan except to the extent that any modifications thereto are consistent with changes in the medical plans provided by [Halliburton] and its subsidiaries for similarly situated active employees.'"

Less than a year after the effective date of the merger,

10

Halliburton started taking action to amend Dresser's employee benefit plans, including Dresser Plan 750. On July 16, 1999, Halliburton agreed to assume the sponsorship of, adopt, and continue Dresser Plan 750,[5] along with other pension and welfare benefit plans sponsored by Dresser as of January 1, 1999. Included in this agreement was Halliburton's promise to assume "all powers, rights, duties, obligations, and liabilities of Dresser" under the plans. The agreement also amended the plans to vest the administration of the plans in the Halliburton Company Benefits Committee and the power to amend or terminate the plans in the Chief Executive Officer of Halliburton. The agreement was executed by officers of Halliburton and was to retroactively amend the Dresser plans effective January 1, 1999.

On December 31, 2002, Halliburton decided to combine the separate welfare benefit plans by merging the Halliburton Plan

---

[5] After the merger with Dresser, Halliburton automatically could have succeeded Dresser as the plan sponsor under the terms of Dresser Plan 750. Dresser Plan 750 contains a provision entitled "Employer Successor," which states that "[a]ny successor entity to an Employer, by merger, consolidation, purchase or otherwise, shall be substituted hereunder for such Employer." The plan defines "employer" as the "company," and "company" as "Dresser Industries, Inc. (d.b.a. Dresser) or any successor entity by merger, consolidation, purchase, or otherwise unless such successor entity elects not to adopt the plan." (emphasis added). In light of the terms of the merger agreement, which named Dresser as the surviving corporation to Halliburton N.C. and provided that Dresser shall possess all rights and obligations as the surviving corporation, Halliburton apparently elected not to adopt the plan through the merger agreement. The July 1999 agreement therefore was necessary to substitute Halliburton as the plan sponsor and give Halliburton all of Dresser's rights and obligations under the plan.

11

with Dresser Plan 750 and renaming it the Halliburton Energy Services, Inc. Welfare Benefits Plan ("HESI Plan").  On January 1, 2003, Halliburton amended the HESI Plan so that various subplans of Dresser Plan 750, including the Dresser Retiree Medical Program, became constituent benefit programs of the HESI Plan.  Under the HESI Plan, "the Company reserve[d] the absolute right to amend the Plan and any or all Constituent Benefit Programs."

In November 2003, over five years after the merger, Halliburton, acting through its plan administrator, amended three subplans of the Dresser Retiree Medical Program.[6]  As Halliburton explained to the Dresser retirees:

> Halliburton has maintained separate retiree medical plans for Halliburton and Dresser retirees since the time of the merger in 1998.  The goal of future changes to the Company's retiree medical plans is to achieve parity for all retirees.  The changes described below to the Dresser Retiree Medical Plan are intended to address the current variations between the Halliburton and the Dresser Retiree Medical Plans.

The amendments provided that effective January 1, 2004, Halliburton's contributions to the cost of medical coverage would be frozen at the 2003 contribution amounts and that plan participants would be responsible for any increase in the cost of coverage.  The amendments also provided that effective January 1, 2005, Dresser retirees who had attained the age of sixty-five and

---

[6]  Halliburton amended Subplans 501, 901, and 902, all of which were listed in the HESI Plan as constituent benefit programs for Dresser retirees.

were Medicare-eligible would be eligible for prescription drug coverage only and that all other medical benefits would be discontinued. Halliburton's prescription drug coverage included a monthly subsidy of $22 per covered adult toward the cost of prescription drug coverage, which was the same subsidy provided to Halliburton retirees with prescription drug only coverage. In its 2003 annual report, Halliburton estimated that the amendments decreased Halliburton's obligation by $93 million in future medical benefit costs.

On December 8, 2003, before the effective dates of the plan amendments, Bryant, who had since retired, wrote Lesar, who had since become Halliburton's Chief Executive Officer and Chairman of the Board. In his letter, Bryant asked Lesar to withdraw the November amendments, contending that the amendments violated section 7.09(g)(i) of the merger agreement because no comparable modifications were made to the plans for Halliburton's similarly situated active employees. Lesar forwarded Bryant's letter to the Halliburton Company Benefits Committee ("Halliburton Benefits Committee" or "Committee") for consideration. On January 21, 2004, Michele Mastrean ("Mastrean"), the Committee chairperson, responded to Bryant by letter, stating that the Committee was denying his request to withdraw the November 2003 amendments because it had concluded that Halliburton's amendments to the retiree program were consistent with its obligations under the merger agreement. Specifically, the Committee determined that

13

section 7.09(g)(i) only limited Halliburton's otherwise unfettered right to amend the Dresser Retiree Medical Program for a period of three years from the effective date of the merger agreement, as provided in section 10.07. Accordingly, the Committee concluded that there was nothing in the merger agreement limiting its right to amend the Dresser Retiree Medical Program.

**B.    Procedural History**

On January 21, 2004, the same date as Mastrean's letter to Bryant, the Halliburton Benefits Committee initiated this declaratory action in the district court against Bryant, James Graves, and Phil Griffin, all of whom are participants in the Dresser Retiree Medical Program, individually and as representatives of a requested class. The Committee's complaint requested certification of a class of all participants (the "Retirees") in the Dresser Retiree Medical Program, i.e., the so-called "grandfathered employees," and sought declarations that (1) Halliburton's November 2003 amendments to the Dresser Retiree Medical Program are permissible and do not violate the terms or provisions of the HESI Plan, the merger agreement, or ERISA; and (2) the merger agreement, including section 7.09(g)(i), does not limit Halliburton's right to amend or terminate the Dresser Retiree Medical Program. The Committee invoked 29 U.S.C. § 1132(a)(1)(B), explaining that the "participants' right to seek

14

judicial clarification of their right to future benefits arises exclusively under [this section in] ERISA."

On May 12, 2004, the Retirees filed counterclaims and third-party claims against the Halliburton Benefits Committee and Halliburton (collectively, "Halliburton"), requesting, inter alia, declaratory and injunctive relief prohibiting any modifications to the Dresser Retiree Medical Program "to the extent any such modifications are inconsistent with medical benefit plans provided to similarly situated active Halliburton employees, and specifically prohibiting the implementation of the November 2003 amendments to the Dresser Retiree Medical Plan."

On August 18, 2004, the district court certified the class to "consist[] of all people who were eligible to participate, directly or indirectly, in the Dresser Retiree Medical Plan on December 31, 1998." On September 10, 2004, the parties filed cross-motions for summary judgment. The Retirees' motion for partial summary judgment requested the district court to find as a matter of law that the merger agreement requires Halliburton to maintain the Dresser Retiree Medical Program in accordance with section 7.09(g)(i) of the merger agreement. Halliburton's motion for summary judgment asked the district court to declare that: (1) the no-third-party-beneficiary clause in the merger agreement bars the Retirees from enforcing the terms of the merger agreement; (2) only the parties to the merger agreement and the directors designated in section 10.07 could enforce the merger

15

agreement, and the three-year window within which the directors designated in section 10.07 were entitled to enforce section 7.09(g)(i) had expired; and (3) the merger agreement imposes no limitation on Halliburton's right to amend or terminate the Dresser Retiree Medical Program. Halliburton also requested the district court to dismiss the Retirees' counterclaims with prejudice.

On December 20, 2004, the district court granted partial summary judgment in favor of the Retirees. The district court found that the merger agreement modified the Dresser Retiree Medical Program based on the signatures of the officers and the approval of the agreement by the boards of directors and the shareholders of both companies. According to the district court, even if the merger agreement itself did not amend the retiree program, Halliburton "waited until November 2003 to change the plans for former Dresser workers" and "Halliburton's wait shows that it recognized the validity of the plan amendments for employees that stemmed from the merger." The district court ordered that "Halliburton must maintain the Dresser Retiree Medical Program for eligible participants and may adjust benefits in that program only if it makes identical changes to benefits for similarly situated active employees."

On December 23, 2004, at the request of Halliburton, the district court entered a separate order entitled "final judgment," which stated that "[t]he partial judgment dated

16

December 20, 2004, is severed and made final." On January 24, 2005, Halliburton filed a notice of appeal.

## C. Subsequent Proceedings

On June 21, 2006, this court dismissed Halliburton's appeal for lack of jurisdiction. See Halliburton Co. Benefits Comm. v. Graves, No. 05-20088, 2006 WL 1751045 (5th Cir. June 21, 2006) (unpublished). We concluded that the district court's partial summary judgment order neither disposed of any particular claim, nor evidenced the district court's intention to sever any specific claim, as required by FED. R. CIV. P. 21, but instead decided a legal issue common to the claims of both parties. Id. at **2-3. We decided that we therefore lacked jurisdiction to decide the merits of the district court's interlocutory order because the district court's order was not "final" within the meaning of 28 U.S.C. § 1291. Id. at *3.

On June 23, 2006, the Retirees moved the district court to amend its order on partial summary judgment to include the certification language contemplated by 28 U.S.C. § 1292(b) to facilitate immediate appellate review. On June 26, 2006, the district court amended its order to provide that it was "of the opinion that [its order originally entered on December 20, 2004] involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from the order may materially advance the ultimate

17

termination of the litigation, as contemplated by 28 U.S.C. § 1292(b) and FED. R. APP. P. 5(a)(3)." On July 5, 2006, within ten days after the district court entered its amended order, Halliburton filed an unopposed petition for permission to appeal, which we granted. See 28 U.S.C. § 1292(b); FED. R. APP. P. 5(a)(3).

## II. DISCUSSION

On appeal, Halliburton argues that section 7.09(g)(i) of the merger agreement does not limit its right to amend, modify, or terminate the Dresser Retiree Medical Program. Halliburton contends that the district court's contrary conclusion errs in several respects. First, Halliburton maintains that the merger agreement did not effect a plan amendment to the Dresser Retiree Medical Program because the agreement was not signed by Dresser's Vice President of Human Resources, thus failing to follow the amendment procedure in Dresser Plan 750. Second, Halliburton asserts that under the plain language of the no-third-party-beneficiary clause in section 10.07, the Retirees cannot enforce any provision of the merger agreement, including section 7.09(g)(i). Halliburton claims that even if the merger agreement did in fact amend the Dresser Retiree Medical Program, only the parties to the merger agreement and the directors designated in section 10.07 were entitled to enforce section 7.09(g)(i), and the three-year window within which the directors could do so has

18

expired. Finally, Halliburton argues that the district court's order requiring Halliburton to maintain the program amounts to an impermissible vesting of the Retirees' benefits because there is no temporal limitation on Halliburton's requirement to continue benefits under the program.

The Retirees respond that section 7.09(g)(i) amended the Dresser Retiree Medical Program to limit the manner in which Halliburton can make future amendments. More specifically, the Retirees claim that section 7.09(g)(i) gave them a "right of nondiscrimination" such that Halliburton cannot modify or terminate the retiree program unless it makes the same changes to the plans for similarly situated active employees of Halliburton. The Retirees argue that the merger agreement meets all of the procedural requirements set forth in Dresser Plan 750 for making a plan amendment to the Dresser Retiree Medical Program, and that in any event, Halliburton ratified the plan amendment by its actions following the merger with Dresser. The Retirees further contend that the no-third-party-beneficiary clause cannot deprive them of their right to seek judicial clarification of the terms of the program because it is ERISA that grants them that right and not the merger agreement. According to the Retirees, Halliburton's argument that any amendment effected a three-year obligation enforceable only by the parties to the agreement and certain directors is not supported by the text of section 7.09(g)(i), which does not contain any temporal limitation on the

19

amendment to the retiree program and does not disclaim enforcement by plan participants. Finally, the Retirees assert that construing section 7.09(g)(i) as a plan amendment does not constitute a vesting of their benefits because the amendment still allows Halliburton to modify or terminate their benefits or the plan as long as it makes the same changes to the benefits or the plans of similarly situated active employees.

We will address each argument in turn. In making these determinations, we review questions of law de novo. See Nickel v. Estes, 122 F.3d 294, 298 (5th Cir. 1997) (reviewing interpretation of ERISA plan terms de novo); Arleth v. Freeport-McMoran Oil & Gas Co., 2 F.3d 630, 633 (5th Cir. 1993) (reviewing interpretation of merger agreement governed by Delaware General Corporation Law de novo).

## A. Effect of the Merger Agreement on Dresser Retiree Medical Program

### 1. Consequences of the Merger Agreement

Inherent in Halliburton's argument that section 7.09(g)(i) does not limit its right to amend the Dresser Retiree Medical Program is the assumption that it possesses the right to amend or terminate the retiree program in the first place. Because this right is not so apparent under the terms of the merger agreement, we begin here.

When companies merge under Delaware General Corporation Law, the surviving corporation succeeds to both the rights and

20

obligations of the constituent corporation, including rights and obligations of every nature, whether they be in contract or in tort. See DEL. CODE. ANN. tit. 8, § 259(a) (2001); 15 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS §§ 7082, 7115 (perm. ed., rev. vol. 1999) [hereinafter 15 FLETCHER CYCLOPEDIA]. Such rights and obligations include those associated with a company's welfare benefit plan. Cf. EDWARD P. WELCH & ANDREW J. TUREZYN, FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 259.1 (2006) (stating that the surviving or new corporation has "sole possession of all rights and powers of the constituent corporations") (emphasis added); 15 FLETCHER CYCLOPEDIA § 7115 (noting that obligations assumed include those arising from contracts of every kind). One of the rights generally reserved under a welfare benefit plan is the company's right to amend or terminate the plan. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995) (noting that because ERISA does not create any substantive entitlement to employer-sponsored health benefits or any other kind of welfare benefits, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans").

Dresser Plan 750 included such a provision, reserving the right for the company to amend or terminate its welfare benefit programs, including the Dresser Retiree Medical Program, at any time. Halliburton did not, however, succeed to Dresser's right to amend or terminate its welfare plans via the merger agreement

or Delaware law. Rather, the merger agreement specified that "the separate corporate existence of [Halliburton N.C.] shall cease and [Dresser] shall continue as the Surviving Corporation." The agreement also explained that Dresser, as the surviving corporation, shall succeed to "all the property, rights, privileges, powers and franchises" and "all debts, liabilities and duties" of the two merged corporations. It was not until January 1999, three months after the effective date of the merger, that Halliburton, as the parent corporation, acquired Dresser's rights and obligations under its employee benefit plans, including Dresser's right to amend or terminate its welfare benefit plans. In a separate agreement dated July 16, 1999,[7] Halliburton agreed to assume all of Dresser's employee benefit plans, including Dresser's welfare plans governed by Dresser Plan 750. In addition to assuming the sponsorship of all employee benefit plans, Halliburton acquired "all powers, rights, duties, obligations, and liabilities of Dresser" under the plans, which included, inter alia, Dresser's right to amend or terminate the plans. It is this post-merger agreement--and not the merger agreement itself--that gives Halliburton the right to amend or terminate the Dresser Retiree Medical Program.

_____

[7] Although Halliburton's separate agreement to assume, adopt, and amend Dresser's employee benefit plans is dated July 16, 1999, the agreement specified that it was to be effective as of January 1, 1999, which was approximately three months after the effective date of the merger.

22

The post-merger agreement not only gave Halliburton a right to amend or terminate the retiree program, but it also imposed a concomitant obligation on Halliburton to maintain the program according to its terms. Cf. 15 FLETCHER CYCLOPEDIA § 7115 (noting that obligations assumed include those arising from contracts of every kind). The terms of the retiree program are at the center of this dispute, as the parties disagree over whether section 7.09(g)(i) of the merger agreement amended the retiree program in such a way as to limit Halliburton's otherwise unfettered right to amend or terminate the plan. We therefore must determine whether section 7.09(g)(i) effectively amended the Dresser Retiree Medical Program so that Halliburton may amend or terminate the program only to the extent it makes the same changes to the plans for its similarly situated active employees.

**2.    Merger Agreement as a Plan Amendment**

**a.    Amendment by Plan Procedure**

In order to amend a welfare benefit plan governed by ERISA, the employer must "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). ERISA imposes no additional formalities on plan amendments. See Curtiss-Wright Corp., 514 U.S. at 80 (stating that ERISA "requires only that there be an amendment procedure"). In particular, there is no requirement that a document claimed to be an amendment to a welfare plan be

23

labeled as such.  See Horn v. Berdon, Inc. Defined Benefit
Pension Plan, 938 F.2d 125, 127 (9th Cir. 1991); see also JOHN F.
BUCKLEY, ERISA LAW ANSWER BOOK 5-7 (5th ed. 2006) [hereinafter ERISA
LAW ANSWER BOOK] ("[A]ny act that is directed to a provision of an
ERISA plan may be deemed to constitute a plan amendment even
though it does not recite that it is intended to amend the plan
and it is not included in a plan document.").  Clearly then, a
provision in a merger agreement could amend a welfare plan, even
if it is not labeled as a plan amendment.  See Beck v. Dillard
Dep't Stores, Inc., 1991 WL 72784, at *1 (E.D. La. May 1, 1991)
(unpublished) (stating that the companies "were at liberty to
clarify their existing Plan in the context of the merger" and
noting that the merged company's severance policy was clarified
as part of the merger agreement); cf. Miss. Power Co. v. Nat'l
Labor Relations Bd., 284 F.3d 605, 622 (5th Cir. 2002)
(anticipating that an obligation to continue the retirees'
medical insurance coverage or to maintain the type or terms of
coverage might "be found in some other document").  However, only
an amendment executed in accordance with the plan's procedures is
effective.  Williams v. Plumbers & Steamfitters Local 60 Pension
Plan, 48 F.3d 923, 926 (5th Cir. 1995); cf. Curtiss-Wright Corp.,
514 U.S. at 85 ("[W]hatever level of specificity a company
ultimately chooses, in an amendment procedure or elsewhere, it is
bound to that level.").

The amendment procedure in Dresser Plan 750, the governing

24

plan for the Dresser Retiree Medical Program, provides that "[t]he Company may amend, modify, change, revise, discontinue or terminate the Plan or any Benefit Agreement at any time by written instrument signed by the Vice President, Human Resources."  Another provision in the plan reiterates that "[t]he Company shall have overall responsibility for the establishment, amendment and termination of any Benefit or of the Plan . . . ."

When an amendment procedure says the plan may be amended by "[t]he Company," "principles of corporate law provide a ready-made set of rules for determining, in whatever context, who has authority to make decisions on behalf of a company."  Curtiss-Wright Corp., 514 U.S. at 80.  In making this determination, we are mindful that

> [t]he answer will depend on a fact-intensive inquiry, under applicable corporate law principles, into what persons or committees within [the corporation] possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision . . . . If the new plan provision is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions . . . served to ratify the provision ex post.

Id. at 85 (internal citation omitted).

Under corporate law principles, officers generally have authority to take action on behalf of the company when that action is approved by the board of directors.  See 2 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 437 (perm. ed., rev. vol. 2006) [hereinafter 2 FLETCHER CYCLOPEDIA]

25

(stating that an officer's authority as an agent for the corporation "may be implied from [his] conduct and the acquiescence of the directors"). Drawing on these principles, we have no trouble concluding that section 7.09(g)(i) of the merger agreement amended the Dresser Retiree Medical Program to provide that Halliburton must maintain the retiree program for eligible participants except to the extent that any modifications are consistent with changes in the medical plans provided by Halliburton for similarly situated active employees. The agreement was signed by Bradford, Dresser's Chief Executive Officer and Chairman of the Board of Directors, and approved by Dresser's Board of Directors. These individuals had authority to act on behalf of the company, and their actions effectively amended the retiree program. See id. § 439 ("A resolution of the board of directors is sufficient to show express authority in a corporate agent or officer . . . .").

Halliburton nevertheless maintains that section 7.09(g)(i) could not have amended the retiree program because the merger agreement was not signed by Dresser's Vice President of Human Resources. Halliburton contends that "an act by 'the Company' is not sufficient; Dresser's procedure requires a writing by the Vice President of Human Resources." Halliburton misreads Dresser's amendment provision, which vests the authority "to amend, modify, change, discontinue or terminate" the benefit programs in the company itself and not in the Vice President of

26

Human Resources.  The reference to the Vice President constitutes a delegation of authority for one way in which "[t]he Company" may amend the plan.  It does not, however, constitute the only way in which the company may amend the plan.  Cf. id. § 495 ("[T]he appointment of such an officer does not mean that the board has completely abdicated its authority.") (citing In re Walt Disney Co. Derivative Litig., 2005 WL 2056651, at *49 n.574 (Del. Ch. Aug. 9, 2005) (unpublished)).  Under corporate law principles, Dresser could revoke its delegation of authority and act to amend the plan in some other manner.  See id. § 437.10 ("A principal who employs an agent always retains the power to revoke the agency."); id. § 495 ("[T]he board constitutes the corporation and does not . . . exercise a delegated authority.").

This interpretation of the Dresser amendment provision is consistent not only with corporate law principles, but also with other provisions in the plan.  Section 6.14, entitled "Action by the Company," provides that

> [a]ny action by the Company pursuant to any of the provisions of this Plan shall be evidenced by a resolution of its Board of Directors over the signature of its secretary or assistant secretary, by written direction of the Chairman of the Board of Directors, or by written instrument executed by any person authorized by the Board to take such action.

The plan amendment procedure essentially designated the latter-- i.e., "written instrument executed by any person authorized by the Board to take such action"--as the way in which the company could amend the plan.  It stated that "[t]he Company may amend

27

. . . the Plan or any Benefit Agreement at any time by written instrument signed by the Vice President." However, as evidenced by the plan provision on delegation of responsibility, the company had the authority not only to "delegate, from time to time, all or any part of its responsibilities under the Plan to such person or persons as it may deem advisable," but also to "revoke any such delegation or responsibility." Put another way, a "written instrument executed by any person authorized by the Board to take such action" was only one of the ways in which Dresser could act to amend the plan. Dresser always had the authority to revoke the Vice President's authority and to evidence its action to amend the plan in some other authorized way, such as by resolution of the board of directors or by written direction of the chairman of the board of directors. Accordingly, Dresser's Board of Directors' approval and Bradford's signature on the merger agreement, as the Chairman of the Board of Directors, were more than sufficient to constitute an action by the company to amend the plan. Cf. ERISA LAW ANSWER BOOK 5-7 ("[I]t would be difficult to argue that an action by the board of directors of an entity would not, even in the absence of specific authority, constitute a valid act of amendment of the plan.").

Halliburton's position that Dresser could amend its welfare plans only through a signed writing of the Vice President of Human Resources is especially curious in light of its own

28

actions.  On at least two occasions following the merger, Halliburton purportedly amended Dresser Plan 750 without a written instrument signed by the Vice President of Human Resources.  First, on July 16, 1999, Halliburton amended Dresser Plan 750 to name the Halliburton Company Benefits Committee as the plan administrator and to vest the power to amend or terminate the welfare plans in the Chief Executive Officer of Halliburton.  That amendment was signed by Lesar and not by the Vice President of Human Resources.  Similarly, on December 31, 2002, Halliburton made several amendments to Dresser Plan 750, none of which was signed by the Vice President.  Thus, as illustrated by its own actions, even Halliburton has recognized that under the amendment provision in Dresser Plan 750, the Dresser welfare plans may be amended by procedures other than a writing signed by the Vice President of Human Resources.

### b.    Amendment by Ratification

In any event, even if the Vice President's signature had been required for section 7.09(g)(i) to amend the retiree program, Halliburton's subsequent actions served to ratify the provision <u>ex post</u>.  <u>See</u> <u>Curtiss-Wright Corp.</u>, 514 U.S. at 85 ("If the new plan provision is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions, such as the executive vice president's letters informing respondents of the termination, served to

29

ratify the provision ex post."); see also 2A WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 764.10 (perm. ed., rev. vol. 2001) [hereinafter 2A FLETCHER CYCLOPEDIA] ("A corporation may bind itself by ratifying an act done by an agent of its subsidiary company."). Under the doctrine of ratification, "[a] corporation may render itself liable for unauthorized acts of its officers by subsequently ratifying them." 2 FLETCHER CYCLOPEDIA § 434; see Depenbrock v. Cigna Corp., 389 F.3d 78, 83 (3d Cir. 2004) ("The doctrine of ratification provides that an improperly authorized amendment may be ratified ex post by subsequent acts.").

Halliburton ratified section 7.09(g)(i) as an amendment to the Dresser Retiree Medical Program in at least two ways.[8] First, the shareholders of Halliburton and Dresser approved the merger agreement on June 25, 1998, four months after the

_____

[8] Halliburton argues that this court cannot consider "parol evidence" in determining whether section 7.09(g)(i) amended the Dresser Retiree Medical Program. Halliburton is correct that extrinsic evidence is not admissible to interpret unambiguous plan documents. See ERISA LAW ANSWER BOOK 2-8 (noting that "[t]he unambiguous written provisions of a plan must control, and extrinsic evidence cannot be introduced to vary express terms of a plan").

However, evidence that tends to show subsequent ratification of a plan amendment is admissible. See 2A FLETCHER CYCLOPEDIA § 778 ("Where the act of a corporate officer or agent was unauthorized or irregular, any competent and material evidence is admissible which tends to show a subsequent ratification by officers having authority to ratify or by shareholders where they may ratify. . . . If the ratification was implied, the conduct of the corporate officers and directors tending to show implied ratification is admissible.").

30

agreement was executed, thereby ratifying the amendment to the extent it was unauthorized.  See 2A FLETCHER CYCLOPEDIA § 764 ("The shareholder may ratify unauthorized or irregular acts of the directors or of other corporate officers . . . by vote at a shareholders' meeting . . . ."); cf. 2 FLETCHER CYCLOPEDIA § 437 (noting that the corporation acts through the action of its shareholders and managing board).

Second, Halliburton administered its obligations under the Dresser Retiree Medical Program consistent with section 7.09(g)(i).  In the five years following the merger agreement, Halliburton maintained separate retiree medical plans for Halliburton and Dresser retirees, and admitted to doing so in a November 2003 letter to the Retirees.  Prior to November 2003, Halliburton never attempted to amend the retiree program in a way that was inconsistent with its obligation under section 7.09(g)(i).  In fact, Halliburton's correspondence on the provision shows that the company was mindful of its obligations under the merger agreement.  For example, Colgan's February 16, 1999, letter to Ables, one of the Dresser retirees, noted that Halliburton was mindful of its obligation to maintain the retiree medical plan, except to the extent it made identical modifications to the medical plans for similarly situated active employees.  Therefore, to the extent it is necessary, Halliburton's ex post actions ratified section 7.09(g)(i) as a valid plan amendment.

31

**B.    Enforceability of Section 7.09(g)(i) as a Plan Amendment**

**1.    Effect of the No-Third-Party-Beneficiary Clause**

Halliburton maintains that under the plain language of the no-third-party-beneficiary clause in section 10.07 of the merger agreement, the Retirees cannot enforce any provision of the agreement, including section 7.09(g)(i).  Halliburton argues that even assuming the agreement amended the Dresser Retiree Medical Program, only the parties to the merger agreement and the directors designated in section 10.07 were entitled to enforce section 7.09(g)(i), and the three-year window within which the directors could do so has expired.

We cannot agree.  First, Halliburton's contention that the Retirees are precluded by section 10.07 from enforcing section 7.09(g)(i) wrongfully equates a plan participant's enforcement of a plan right under ERISA with a third party's enforcement of a provision in a contract.  The Retirees are not seeking to enforce a breach of contract claim under the merger agreement.  As they recognize, principles of preemption prevent them from doing so. Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 62 (1987) (holding that a contract claim is preempted by ERISA if the claim "relate[s] to [an] employee benefit plan").  Instead, they seek a clarification of their rights to future benefits under the terms of the retiree program.  See 29 U.S.C. § 1132(a)(1)(B) (stating that a civil action may be brought by a participant or

32

beneficiary under ERISA "to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan").  The detailed provisions of § 1132(a)(1)(B) "set forth a comprehensive civil enforcement scheme" that was "intended to be exclusive."  Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987).  Simply put, enforcement of a plan's provisions, including any amendments thereto, falls exclusively in ERISA's remedial scheme.  See Morales v. Pan Am. Life Ins. Co., 914 F.2d 83, 87 (5th Cir. 1990) ("ERISA's civil enforcement provision creates an exclusive remedial scheme focusing on the terms of the plan.").  To adopt Halliburton's argument that a provision in a contract, or more specifically, a no-third-party-beneficiary clause, can trump rights prescribed by ERISA would fly in the face of the exclusive remedial scheme prescribed by Congress for plan participants and beneficiaries to enforce rights under employee benefit plans.[9]  Cf. Dallas County Hosp.

_____

[9]  Halliburton relies on two cases, neither of which is controlling here.  First, Halliburton cites In re Fairchild Indus., Inc. & GMF Invs., Inc., ERISA Litig., 768 F. Supp. 1528, 1533 (N.D. Fla. 1990), a case in which the district court rejected the plaintiff's argument that a purchase agreement constituted a plan amendment "[b]ecause ERISA prohibits the amendment of an employee benefit plan through informal written documents, or by any other means except as specified in the plan documents themselves . . . ."  The court noted that its conclusion was "buttressed by the contracting parties' clearly expressed intent not to create any third party rights by executing the agreement."  Id. at 1533.
     The district court's reliance on the no-third-party-beneficiary clause was not dispositive to its holding; rather, it relied on the informality of the purported amendment and the fact that the amendment was not executed in accordance with the plan

<u>Dist. v. Assocs.' Health & Welfare Plan</u>, 293 F.3d 282, 289 (5th Cir. 2002) (stating that whether a party is a beneficiary under a contract, which is not itself an ERISA plan, "is of no relevance in determining whether it is an ERISA beneficiary").

Second, Halliburton's claim that only certain parties were entitled to enforce section 7.09(g)(i) for a three-year period is not supported by the express language in the merger agreement.[10] Section 10.07 provides that notwithstanding its prohibition on third-party beneficiaries, certain directors are entitled "to

---

documents, concluding that "the Purchase Agreement could not legally operate to amend the plan documents." <u>Id.</u> Such is not the case here, where the parties executed section 7.09(g)(i) in accordance with the amendment procedures in Dresser Plan 750. In addition, to the extent <u>In re Fairchild</u> holds that ERISA imposes formalities on plan amendments, the Supreme Court rejected such an approach in <u>Curtiss-Wright Corp.</u>, 514 U.S. 73.

Moreover, we cannot give any weight to Halliburton's reliance on <u>LaFata v. Raytheon Co.</u>, 147 F. App'x 258, 261 (3d Cir. 2005) (unpublished), because that decision has nothing to do with amendments to an ERISA plan.

[10] Before the district court, Halliburton initially took the position that section 7.09(g)(i) of the merger agreement <u>had</u> in fact amended the plan, but that it had done so for only a three-year period. <u>See</u> 8 R. 292-306, Am. Compl. ¶ 16 (stating that "[c]ertain provisions of the Halliburton/Dresser Merger Agreement described permissible amendments to Dresser's welfare benefit programs during a three-year period following the effective date of the merger"); <u>id.</u> ¶ 31 ("The Merger Agreement contains certain provisions that limited Halliburton's ability to change or terminate the Dresser Retiree Program benefits for a period of three years."); <u>id.</u> ¶ 33 ("As a result of these provisions [including section 7.09(g)(i)], Halliburton committed to maintain the Dresser Retiree Program, save for changes consistent with changes to the benefits of 'similarly situated active employees,' for a period of three years."). In front of this court, however, Halliburton has argued that the merger agreement did not amend the retiree program, but that if it did, it did so for only three years pursuant to section 10.07.

enforce the provisions of Sections 7.09 and 7.13 on behalf of [Dresser's] officers, directors, and employees" during the three-year period following the effective date of the merger. The problem with Halliburton's argument is that it does not give effect to the language in section 7.09(g)(i), the provision directed at the retiree medical plan. The explicit language in section 7.09(g)(i) does not contain any temporal limitation on its enforcement and does not disclaim enforcement by plan participants. Rather, it simply states that Halliburton shall cause the Surviving Corporation to take all corporate action necessary to maintain the Dresser Retiree Medical Program, "except to the extent that any modifications thereto are consistent with changes in the medical plans provided by [Halliburton] and its subsidiaries for similarly situated active employees."

A comparison of section 7.09(g)(i) with the section succeeding it, section 7.09(h), provides further support that the parties did not intend to impose any enforcement limitations on the retiree program, other than the one expressly provided for in section 7.09(g)(i). Section 7.09(h) requires Halliburton to provide Dresser employees with benefits comparable to similarly situated Halliburton employees "until the third anniversary of the effective time" of the merger agreement. Section 7.09(h) is significant because it illustrates that the parties knew how to limit the duration of Halliburton's obligation for Dresser

employees, in connection with section 10.07 of the agreement.  In drafting the sections in 7.09, the parties carefully drew a distinction between employees and retirees.  To construe "employees" in section 10.07 to include "retirees" in order to impose a three-year limitation on the obligations under the retiree program would render section 7.09(g)(i) meaningless and unnecessary in light of section 7.09(h).  We decline to read a three-year requirement into section 7.09(g)(i).

## 2.    Consequences of the Plan Amendment

Finally, Halliburton misconstrues section 7.09(g)(i) as a grant of "permanent benefits."  Halliburton argues that section 7.09(g)(i) violates the prohibition in the merger agreement on vested benefits and that, in any event, there is no clear intention to vest benefits under section 7.09(g)(i) as required by Spacek v. Mar. Ass'n, 134 F.3d 283, 293 (5th Cir. 1998), abrogated on other grounds by, Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739 (2004).  Section 7.09(g)(i) states that Halliburton must maintain the Dresser Retiree Medical Program, "except to the extent that any modifications thereto are consistent with changes in the medical plans provided by [Halliburton] and its subsidiaries for similarly situated active employees."  To argue that this provision constitutes vesting amounts to a misunderstanding of what it means to "vest" a right or benefit under ERISA.  An employer "vests" a benefit under

36

ERISA when it intends to confer unalterable and irrevocable benefits on its employees, and it does so by using clear and express language. See Spacek, 134 F.3d at 293 (stating that "courts may not lightly infer an intent on the part of a plan to voluntarily undertake an obligation to provide vested, unalterable benefits") (internal alterations, quotation marks, and citation omitted). Nothing in section 7.09(g)(i) requires Halliburton to maintain the retiree program indefinitely; rather, Halliburton is free, at any time and for any reason, to amend or terminate the program, as long as it does the same for its similarly situated active employees.[11] Because Halliburton may modify or terminate the program, the benefits have not vested. See Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir. 1995) ("If a contract provides that benefits can be terminated, then those benefits do not vest.").

Nor is it problematic that section 7.09(g)(i) precludes future amendment or termination of the plan, except as consistent with the provision's terms. Employers generally are free under

---

[11]  Accordingly, section 7.09(g)(i) does not violate the other terms in the merger agreement. Sections 4.13(j) and 5.13(j) of the agreement make clear that the merger agreement does not "create or give rise to any additional vested rights." Under section 6.02(a)(i) and (b)(i) of the agreement, Dresser and Halliburton covenanted not to amend any employee benefit plans to vest any employee benefits under such plans. That section 7.09(g)(i) amended the Dresser Retiree Medical Program is not inconsistent with these provisions because the amendment does not give rise to vested rights, but merely limits the way in which Halliburton can amend or terminate the retiree program.

37

ERISA to modify or terminate plans, but if the plan sponsor cedes its right to do so, it will be bound by that contract. See Vasseur v. Halliburton Co., 950 F.2d 1002, 1006 (5th Cir. 1992); see also Hughes v. 3M Retiree Med. Plan, 281 F.3d 786, 790 (8th Cir. 2002) ("An employer offering welfare benefits may unilaterally modify or terminate benefits at the employer's discretion, so long as the employer has not contracted an agreement to the contrary."); 2 MICHAEL J. CANAN, QUALIFIED RETIREMENT PLANS § 24:134 (2006) ("[Welfare benefit plans] can be amended or terminated by the employer provided there is no contractual obligation that prevents such an amendment."). This court has recognized that a reservation-of-rights clause in a plan document, which allows a company to amend or terminate a plan at any time, "cannot vitiate contractually vested or bargained-for rights. To conclude otherwise would allow the company to take away bargained-for rights unilaterally." Int'l Ass'n of Machinists & Aerospace Workers v. Masonite Corp., 122 F.3d 228, 233 (5th Cir. 1997) (emphasis added).

We decline to allow Halliburton to unilaterally take away the "bargained-for rights" that Dresser and Halliburton negotiated and made on the retiree program as part of their merger agreement. The parties were free to impose contractual obligations on the right to amend or terminate the Dresser Retiree Medical Program, and they did. See id. Because of these limitations, Halliburton cannot alter the retiree program, except

38

as consistent with the plan as amended by section 7.09(g)(i).

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the Amended Order on Partial Summary Judgment of the district court.